394 So.2d 334 (1980)
FIREMAN'S FUND AMERICAN INSURANCE COMPANY, a corporation, et al.
v.
John F. COLEMAN et al.
Nos. 78-365-78-370 and 78-388-78-393.
Supreme Court of Alabama.
August 8, 1980.
On Rehearing February 6, 1981.
*335 L. Merrill Shirley, Elba, Harry Cole & John M. Milling, Jr. of Hill, Hill, Carter, Franco, Cole & Black, Montgomery, Huey D. McInish and Alan C. Livingston of Lee & McInish, Dothan, for appellants.
Gareth A. Lindsey, Elba, W. Sidney Fuller, Andalusia, James W. Kelly, Geneva, Frank J. Tipler, Jr., Andalusia, for appellees.
Francis H. Hare, Jr., Birmingham, for amicus curiae.
FAULKNER, Justice.
These appeals are from consolidated cases brought under the third party provisions of the Workmen's Compensation Act (§ 25-5-11, Code 1975) against four co-employees and Fireman's Fund. From adverse judgments below, each of the defendants appeals.
John Coleman, Raymond Chamblee, Jerome Flowers, Charles Smith, Wiley Williams, and Harold Weeks, Jr., plaintiffs, were employed by Dorsey Trailer, Inc., a corporation that manufactures flatbed and van type truck trailers. On July 15, 1977, while they were installing 24"-wide fiberglass scuff bands along the base of the interior walls of an unventilated van type trailer, using a highly flammable solvent-based glue, sparks from either the screwdrivers or the electric junction box into which the screwdrivers were plugged, came in contact with fumes from the glue, causing a flash fire within the trailer.
Plaintiffs and their wives filed individual suits against Fireman's Fund, the compensation carrier which was also the liability carrier of Dorsey, alleging negligent and/or wanton plant inspection; and against David Logan, a vice-president of Dorsey; Shelby Bryan, Line Supervisor; Mark Holt, Director of Personnel and Labor Relations; and George Kennedy, General Supervisor over Line Supervisors; alleging negligent failure to supervise, and to correct the operation of the adhesive application process. The cases were tried to a judge sitting without a jury. The judge, on January 25, 1979, entered judgments in favor of each plaintiff, and against all of the defendants as follows:

Plaintiff Judgement
1. John Coleman $1,850,000.00
2. Mrs.John Coleman 150,000.00
3. Raymond Chamblee 1,600,000.00
4. Ellowayne Chamblee 150,000.00
5. Jerome Flowers 2,000,000.00
6. Wiley Williams 700,000.00
7. Wiley Williams, as Administrator
 of the Estate of
 Dianne Williams 50,000.00
8. Charles Smith 1,000,000.00
9. Harold Weeks 75,000.00
 _____________
 Total: $7,575,000.00

Appellants filed motions for new trial and motions for post-judgment discovery. They requested a continuance to complete post-judgment discovery and to make a showing of what they expected to prove. Fireman's Fund and Logan, Kennedy, Bryan, and Holt appeal from denials of their motions.
The principal issues presented for review are these:
1. Should Grantham v. Denke, 359 So.2d 785 (Ala.1978), be overruled? If it is not overruled, should it be extended to corporate officers and supervisory employees?
2. Should Grantham be extended to invalidate the statutory immunity granted to compensation carriers under § 25-5-11, Code of Alabama, 1975?
3. Is the adjudication of liability supported by sufficient evidence when tested against appropriate legal standards of liability?
4. Were the damages awarded excessive?

I
This Court held in Grantham that the statutory immunity for co-employees violated *336 § 13, Constitution of Alabama, 1901, and was therefore void. The reasoning in Grantham does not need to be repeated here. Grantham was followed in Pipkin v. Southern Electrical & Pipefitting Co., Inc., 358 So.2d 1015 (Ala.1978), and Gardner v. Bethea, 364 So.2d 308 (Ala.1978).
Next, the appellants argue that Grantham did not decide the question of immunity of supervisory employees and corporate officers. To that narrow statement, the answer is no, because the question of an officer's immunity was not raised. See Jones v. Watkins, 364 So.2d 1144 (Ala.1978). Moreover, that question was not raised in Jones. The dictum in Jones indicates that an officer's liability may depend on his function at the time of injury to an employee. We now decide that the immunity test under § 13 of the Alabama Constitution is equally applicable to all parties other than the employer (§ 25-5-11(a), Code of Alabama 1975); and, therefore, in the context of the instant case, we reaffirm Grantham and extend its holding as to the immunity provisions of § 25-5-11 as it relates to each of the parties defendant named herein, including the workmen's compensation insurance carrier. Cf. United States Fire Insurance Co. v. McCormick, 286 Ala. 521, 243 So.2d 367 (1970); Queen City Furniture Company v. Hinds, 274 Ala. 584, 150 So.2d 756 (1963).

II
We now determine the liability of the individual defendants David Logan, Mark Holt, George Kennedy, and Shelby Bryan.
David Logan was Vice-President in charge of manufacturing at Dorsey Trailers and was the immediate superior and supervisor of both Mark Holt and George Kennedy. He was responsible for personnel functions, industrial engineering functions, all manufacturing facilities and maintenance and production control scheduling. He also, as overall supervisor of the plant, was involved in the organizational aspects of providing for the safety of the men in the plant. Logan personally made the necessary safety rules and regulations for the workmen. Thus, the employer, Dorsey, had delegated its duty of providing a safe work place for its employees to its employee David Logan as one of his personal job duties.
Mark Holt was Director of Personnel and Labor Relations for Dorsey Trailers. His job duties included serving as supervisor in charge of plant safety for Dorsey. He assisted in coordinating the plant safety program, saw that safety meetings and safety inspections were held, investigated safety problems, and kept safety records. Holt, an employee at Dorsey, had also been delegated a portion of Dorsey Trailers', the employer's, duty to furnish a reasonably safe work place and suitable appliances and materials with which to work.
George Kennedy served as General Supervisor or Foreman over the line supervisors and was directly responsible to David Logan. He was generally responsible for getting the trailers out on schedule and had between 120 and 150 men, including seven supervisors, working under him. He testified at trial that one of his prime considerations was the safety of the men. On the job, Kennedy was told by his boss Logan what was safe after Logan developed the safety rules and then Kennedy advised the men what was and what was not safe and explained safety procedures and precautions. As a part of his employment responsibilities, Kennedy had also been delegated a portion of Dorsey's non-delegable duty to provide his co-employees with a reasonably safe work environment.
Shelby Bryan was the Line Supervisor in charge of Department 78, the area where the injured plaintiffs, Coleman, Chamblee, Flowers, Smith, Williams and Weeks worked. He was their immediate supervisor and in turn was under George Kennedy in Dorsey's supervisory hierarchy. Bryan assigned the men to the various jobs that needed to be done within the department, and saw that the work was performed according to the instructions of his supervisors, Logan and Kennedy, using the materials and tools supplied them by Dorsey. He was in charge of lining-out the van type *337 truck trailers, including the application of the scuff bands using a solvent based adhesive and screws. Having reviewed the record we find no indication that Dorsey Trailers delegated to Bryan any portion of its duty to provide a reasonably safe place of employment nor did Bryan voluntarily assume any such duty.
Having determined that Logan, Holt, and Kennedy had as an element of their employment duties the duty to assure a reasonably safe work place for their co-employees, we examine the record to determine if this duty was breached by personal fault. David Logan testified at trial that he personally knew the solvent based glue, either DAP or Scotch Grip, was highly flammable. He was aware that it was dangerous for such glue to be used in the trailers as the injured men were using it because the top was off the gallon containers so that the fumes could escape and collect in the unventilated trailer, yet he did not post or have posted any signs warning of this danger. He testified the safest way to have installed the scuff bands using both the Scotch Grip glue and the screws would have been to let the glue fumes clear and then use the electric screwdriver, the only type screwdriver used by Dorsey.
Some two months before the fire Logan gave personal instructions to George Kennedy, the general foreman, and to two or three production people (none of them among the injured men) on the installation of the scuff bands in a trailer using the glue although not with the added screws. At that time the tops were off the glue cans. He told these people that the glue was dangerous but at trial could not recall anything he might have said relating to any particular things that might be done with reference to its use to minimize the danger. Logan also got the injured men the paint rollers they used to apply the glue.
Although he could not order new building materials, Logan could make recommendations. As a result of reading an article in trade literature, he suggested the testing of an emulsion based glue, the non-flammable Borden's brand, to replace the solvent based glue. The Borden's glue was approved by Dorsey's Research and Development Department two weeks prior to the fire and was on order at the time of the fire. Logan testified that he did not stop the finishing of the trailers by applying the scuff bands until the rest of the safer adhesive came in. He admitted that he could have stopped the finishing of the trailers by rescheduling them to a later date.
On the basis of this and other evidence the trial judge as trier of fact properly found that Logan had breached his duty of due care by personal fault, in failing to utilize with reasonable care the instrumentalities within his control so as not to injure his co-employees.
Mark Holt was Dorsey's safety coordinator in charge of inspecting the plant to discover and correct safety hazards and use of unsafe materials, yet he testified that he did not even know that Dorsey had the Scotch Grip adhesive in the plant and also had no knowledge of the danger of this adhesive prior to the fire. Although he had the available resources to do so, he had never investigated the flash points of this flammable glue or of any other of the different materials used by the employees of Dorsey in the plant other than paint. Holt testified that with a dangerous flammable material such as this glue, reference should have been made somewhere in the safety program by someone but he did not include in any of the safety program meetings any discussion or instructions regarding the general use of dangerous materials.
While he was charged with making safety inspections with the Union and accompanying Fireman's Fund and OSHA on their plant inspections to discover safety problems, Holt testified that he never saw the glue either being applied or sitting in the warehouse although Dorsey had used the glue for some time for other purposes and to apply the scuff bands. There was other testimony that placed Holt in locations in the plant where he could have seen the glue in open containers and being applied. Having surveyed the evidence regarding Mark Holt's actions as safety coordinator, the trial *338 judge's determination that Holt had failed to act with due care in performing his job duties was supported by the record.
George Kennedy, the general foreman, knew that the Scotch Grip glue was flammable and that its fumes would collect in an enclosed trailer open only on the back end with no other ventilation where electric screwdrivers were in use, creating a dangerous situation. He was to instruct the workmen on what was and what was not safe, yet he testified that he helped David Logan in the demonstration of how to apply the scuff boards with the solvent based glue. He did tell his men that they needed fire extinguishers to work in the trailers but did not find out what type would work best on flammable solvents. Workmen who were under his supervision testified that they applied the scuff bands in Department 78 as they had been shown and instructed by Kennedy but that he never gave them specific safety instructions about the use of the glue and the electric screwdrivers in the confined area of the trailers. Thus, the trial judge could have properly determined that Kennedy too breached his duty through personal fault.
Having applied the test we set forth, we have determined that the trial judge's decision to hold those three of the individual defendants Logan, Holt and Kennedy on whose part at least a portion of Dorsey's duty to provide a safe work place for its employees had devolved, liable, was correct. However, having determined that Shelby Bryan had no such duty to his fellow employees, Bryan should not have been held liable.

III
In Beasley v. MacDonald Engineering Co., 287 Ala. 189, 249 So.2d 844 (1971), this Court held that a compensation carrier was liable in a third party action where it voluntarily undertook to inspect an employer's premises for safety, and to provide safety inspections. We do not find from the evidence that the carrier here was wearing only one hat, and thereby was exempt from liability under Beasley's holding.
Even though Fireman's Fund had no common law duty to provide a safe place and working conditions for Dorsey's employees, it voluntarily undertook to inspect the premises pursuant to a mutual agreement it had with Dorsey. A loss control technician from Fireman's Fund along with Mark Holt and a union representative made plant inspections on a quarterly basis prior to the fire. Before inspecting the plant, Holt and the Fireman's Fund representative reviewed losses and accident investigation reports since the last inspection. Then the loss control technician, Holt, and the union representative walked through the plant listening to employees' safety complaints and checking for safety hazards, including safety and housekeeping problems, poor stacking, and dangerous materials, which were noted by the Fireman's Fund technician. On the basis of this survey of the entire plant, the Fireman's Fund representative would make recommendations concerning unsafe conditions at a meeting with the general foreman of the plant following the plant tour. Written reports of the inspection and recommendations were filed with Dorsey and Fireman's Fund's Underwriting Department.
Fireman's Fund performed these safety inspections and made the recommendations strictly in an advisory capacity. It did not attempt to take over the safety functions and safety program of Dorsey and so advised Dorsey, Mark Holt, and others in the trailer company both orally and on the written recommendations sheets drawn up by the loss control technician. The loss control technician was not to be solely relied on to discover and correct all hazardous activities in the plant. Fireman's Fund could not enforce compliance with its recommendations, although it maintained the right to review the risk at the end of the policy period, and possibly could have changed the risk classifications. Nonetheless, Dorsey incorporated these inspections every three months into its own safety program which also included union safety inspections, OSHA spot checks, a safety grievance procedure for workmen, regular safety meetings *339 between the foremen and supervisors and the employees under them, and safety rides and a labor agreement furnished to the men. Dorsey attempted to implement the recommendations made by its workmen's compensation insurer as a result of the inspections.
Three days prior to the fire an inspection was made by Mark Holt; Charlie Johnson, the loss control technician for Fireman's Fund; and J. I. Crocker, the union representative. During their tour of the plant, they walked through and inspected Department 78, the Catch-Up Department, where the scuff bands were being installed in the trailers, and ended their rounds in Department 78 again. There was testimony at the trial by Mr. Crocker that while they were in Department 78 an open five gallon Scotch Grip glue container with a household broom stuck in it and scraps of plywood around it was in plain view of the three-man inspection team and that he told Mr. Holt and Mr. Johnson that the glue was dangerous. Additional testimony indicated that at the time of the Fireman's Fund inspection the glue was being used by the men in that department to install scuff bands in the trailers just as it was the day of the accident. A witness for the plaintiffs testified that Holt, Crocker, and Johnson came within three to four feet of the trailers where the scuff bands were being installed using the glue applied to the bands with rollers and household brooms and screws. Although both Holt and Johnson disputed the testimony that the glue was pointed out to them on the inspection trip and that they had seen the Scotch Grip being used in Department 78 to connect scuff bands to the interior walls of the trailer, Johnson, the Fireman's Fund inspector, testified that if he did pass that close to the end of the trailer where the scuff bands were being applied in a fashion he admitted was dangerous due to the flammability of the glue, he should have seen it and would not have done his job properly if he passed that close to the trailer and did not observe it. The trial judge, as trier of fact, determined that Fireman's Fund was guilty of negligent inspection. We cannot, after examining the evidence, determine that he was plainly and palpably wrong.

IV
Next, both the individual defendants, Logan, Holt, Kennedy and Bryan, and Fireman's Fund assert that the injured men were guilty of contributory negligence as a matter of law as each of them testified at trial that he knew the glue was dangerous and flammable yet none of them filed a formal grievance concerning its use. The defendants below had the burden of establishing this affirmative defense. This Court in United States Fidelity & Guaranty Co. v. Jones, 356 So.2d 596 (Ala.1978), stated:
The question is one of law for the Court only when the facts are such that all reasonable men must draw the same conclusion therefrom. It is a question for the jury when, under the facts and circumstances, reasonable minds may fairly differ upon the issue of negligence. Baptist Medical Center v. Byars, 289 Ala. 713, 271 So.2d 847 (1972); Southern Railway Co. v. Carter, 276 Ala. 218, 160 So.2d 628 (1963); and Mackintosh v. Wells, 218 Ala. 260, 118 So. 276 (1928). This, however, cannot be viewed from the vantage of hindsight. The fact that a jury did not find contributory negligence is no evidence that it was properly submitted to the jury in the first instance.
While the trier of fact in that case was the jury and in the present case was the trial judge, the principles involved are the same.
Here, though it is evident that Coleman, Chamblee, Smith, Flowers, Williams, and Weeks knew of the dangerous potentiality of the glue, the voluntariness of their encounter with it in combination with the sparking electric screwdrivers within the confined space of the unventilated trailer was a question for the judge as trier of fact. The workmen testified that they were furnished the materials that they were to use by their superiors and they had to work with those materials and in that dangerous environment or quit work. If *340 they refused to apply the scuff bands using the glue and screws in the demonstrated fashion, they could have been fired for insubordination. There was dispute whether or not the federally required sign indicating that employees could refuse to work with anything they felt would endanger them was posted before the fire. This issue was considered by the trial judge and could quite properly have been rejected.

V
Finally, we examine the issue of excessive damages.

(1) Raymond E. Chamblee.
Chamblee had acute second and third degree burns to his face, neck, both arms, forearms, and hands, as well as his back and scattered areas across both knees and the left ankle. Those burns make up 35% of the total body surface. He had 2% third degree burns and 33% second degree burns.
Dr. Allan R. Dimick, by his testimony, explained the degree of burns. One, a first degree burn is like a severe sunburn; two, a second degree burn raises blisters. In those two, the nerve endings are irritated, hypersensitive, and when they are touched, there is severe pain. Three, in a third degree burn the skin is cooked, burned, coagulated, and there is no pain initially. After five to seven days the nerves start to grow back. They are irritated and hypersensitive. There is a great deal of pain similar to pain in a second degree burn.
Chamblee was hospitalized 19 days. He returned to work three months later, but suffers some functional impairment in performing his employment tasks.

(2) John F. Coleman.
Coleman had second and third degree burns to 24% of his body. The burns involved his forehead, face, neck, both arms, elbows, forearms, hands, scattered areas over his left eye and left leg, left ankle and foot, and the inside of his right leg close to the ankle. He had plastic surgery to those areas of the third degree burns, consisting of 4% of his body. He suffered 20% second degree burns. Coleman was in the hospital 32 days. He returned to work nine months after his injury. He has a limitation of motion in his left leg and left arm. According to him, "it does not get any better."

(3) Wiley Williams.
Williams had burns involving about 6% of his body. However, he had no third degree burns, and he did not have to have any skin grafting. He was in the hospital for seven days, and returned to work two months after the accident. Other than being cautious about his left hand, he believes that he can "do anything I could do before the fire."

(4) Jerome Flowers.
Flowers had second and third degree burns to about 31% of his body surface, including face, neck, arms, hands, a line across the lower back, both thighs, knees and legs. Seven percent of his body had third degree burns, and 24% had second degree burns. He was in the hospital for 38 days. He has scar area on both arms and legs that would be void of sweat glands, and growing hair. His activity is limited by the scar tissue. He says that he has reconciled himself to wearing his scars for the rest of his life. Flowers has not returned to work.

(5) Charles Smith.
Smith received acute second degree burns involving 20% of his body, including his face, both arms, back, forearms, one hand, and lower abdomen. He had no third degree burns, and no skin grafting was required, but he has permanent scars. He was hospitalized for 11 days, and returned to work five months after his injury.

(6) Harold Weeks, Jr.
Weeks received no burns in the accident. He did, however, have the hair singed off both arms, the back of his head, and one-half of his beard. His injury was psychological. A psychiatrist testified that Weeks had traumatic neurosis, which causes a personality change and regression, anxiety, depression, lack of self-confidence, and withdrawal.
The doctor saw Weeks on four occasions. The time involved was three and one-half *341 hours. He further testified that Weeks will recover when this litigation terminates.
Weeks had no loss of earnings, no medical expenses, and no disability.
The remaining damages were awarded by the trial judge to wives of these men for loss of consortium.
Appellants contend that the damages awarded by the trial judge are excessive. Prominent among the cases cited by them for this contention are Beloit Corporation v. Harrell, 339 So.2d 992 (Ala.1976), and Alabama Power Company v. Henderson, 342 So.2d 323 (Ala.1976). In Beloit this Court sustained a jury verdict of $800,000.00 for virtual amputation of both hands, and considerable loss of earning capacity. In Henderson this Court approved a jury verdict of $500,000.00 for severe injuries and loss of earnings of $52,000.00. It is to be noted that these cases were jury verdicts.
In this case the damages were awarded by a trial judge sitting without a jury. We have not been cited a case where a judgment of damages awarded by a judge sitting without a jury has been overturned by this Court.
After reviewing the evidence relating to damages, we hold that these causes (except as to Bryan) must be remanded for a new trial on the issue of damages only. It is apparent on the face of each judgment that substantial punitive damages were included; while we find the evidence sufficient to support award of punitive damages in the direct actions, the judgments in the derivative actions by spouses cannot include punitive damages. See Atlanta Life Insurance Co. v. Stanley, 276 Ala. 642, 165 So.2d 73 (1964). They include only damages for loss of services.
Although the injuries suffered by plaintiffs are severe, we find that the damages in the amounts awarded, including punitive damages, are not justified by the evidence; therefore, pursuant to Rule 59, ARCP, and the inherent authority of this court, these causes (except as to Bryan) are directed to be reopened by the trial court for reassessment of damages.
In arriving at the award of damages, we direct that the trial judge consider, and report in findings of fact and conclusions of law, elements of occupational disability, physical impairment, pain and suffering, mental anguish, impairment of earning capacity, etc., and punitive damages in the direct actions. Only loss of services shall be found and reported in the spouses' actions.

VI
We affirm the trial court on all issues except as to damages, and except as to defendant Shelby Bryan. The judgment against Shelby Bryan is reversed and rendered. The judgments of the amount of damages are reversed and remanded for a new trial on the issue of damages only. The judgments of liability are affirmed.
AFFIRMED IN PART, REVERSED AND REMANDED IN PART, AND REVERSED AND RENDERED IN PART.
BLOODWORTH, J., concurs.
JONES, J., concurs in the result.
SHORES, J., with whom ALMON, J., joins, concurs in the result.
EMBRY, J., concurs specially.
TORBERT, C. J., and MADDOX and BEATTY, JJ., dissent.
JONES, Justice (concurring in the result):
I concur in the majority opinion to remand these causes for reconsideration of the issue of damages as well as in the order reversing and rendering as to Defendant Shelby Bryan.
Having vacillated on the proper role of § 13 as the constitutional test of the legislatively pronounced immunity provisions, I find that I must now clarify my position as it has evolved through the recent series of cases on this issue. I am in full agreement with Justice Shores' treatment of the history of § 13 and see no necessity to elaborate on the points covered in her concurring opinion. Instead, I will treat separately the *342 issues of co-employee immunity and compensation insurance carrier immunity, as well as the criteria for liability, within the context of the respective contentions of the Appellants.

I.

Co-employee Immunity
Counsel for the individual Defendants, insisting that Grantham should be overruled, advance several contentions. Each of them has as its central thrust that Grantham misapplied § 13, Alabama Constitution 1901. The most persuasive of these arguments is summarized in two cases of other jurisdictions that reject constitutional attacks on similar immunity statutes. The Supreme Court of Pennsylvania in Jadosh v. Goeringer, 442 Pa. 451, 275 A.2d 58, 60-61 (1971), reasoned:
"The employee received economic insurance that his employment-related injuries will be compensated. He surrenders the right to sue employers or fellow employees for negligence but he no longer need prove negligence, his own contributory negligence is no longer a bar, and he, too, can no longer be sued for negligence by a fellow employee. Such a comprehensive program is not unconstitutional."
The Illinois Court of Appeals addressed an identical challenge in Mier v. Staley, 28 Ill.App.3d 373, 329 N.E.2d 1, 8 (1975):
"Plaintiff also asserts that immunity results in a violation of the constitutional provisions giving every person a remedy for his injuries. (Article I, § 12, Illinois Constitution of 1970, Article II, § 19, Illinois Constitution of 1970).
"These sections do not require that any specific form or remedy be provided Plaintiff, rather they are the expression of a philosophy that some remedy be provided." (Citations omitted.)
Implicit in these and other similar holdings is the quid pro quo test, the keystone of Grantham. As evidenced in the above-quoted language, Jadosh and Mier found this test had been met in a combination of two factors:
(1) The "comprehensive" compensation scheme affords a remedy for job-related injury; and
(2) It provides mutuality of immunity among co-employees; i. e., the injured employee is denied the right to sue a fellow employee but in exchange is granted immunity from suit by a fellow employee.
The point of difference between this rationale and Grantham is substantial and significant. Those holdings, of which Jadosh and Mier are typical, may be said to adopt the collective interest or enterprise interpretation, while Grantham applies the severability of interest concept. That is to say, Grantham views § 13 (absent a perceived social evil eradication) as proscribing abolition of the fundamental guarantee that "every person for any injury done him, in his ... person ... shall have a remedy by due process of law" except within the framework of a quid pro quo test; and its holding applies this test to the relationship of the separate and several parties affected by the proposed immunity.
The quid pro quo test of Grantham asks: Is there substantial "give and take" as between the injured party and the separate individual party to whom immunity is granted? Those cases holding contrary to Grantham pose a different question. Their concern is with the providing of some remedy against any party for the remedy abolished, not the substitution of a remedy against the same party to whom immunity is granted. It is of no consequence under their interpretation, that the substituted remedy is imposed exclusively against one partythe employereven though the statutory immunity provision embraces parties "other than the employer."
I find no justification for such an interpretation of § 25-5-11 in the instant context. I view the Workmen's Compensation Act as a statutory scheme regulating compensation for job-related injuries which governs the relationship between the employer and the injured employee. Its constitutional validity is sustainable by the application of a quid pro quo test to the employer-employee relationship of the affected *343 parties. Any legislative attempt to extend the immunity provisions to additional parties is subject, upon constitutional challenge, to the same individually-particularized scrutiny; that is, the party to whom immunity is granted (here, the alleged tortfeasor co-employee) likewise must be subjected to a corresponding obligation to the injured employee. Stated otherwise, the "give" must be substantially commensurate with the "take"; and both elements must be present as between the affected parties independent of the rights and obligations of other parties.
The only exchange of benefits, supporting co-employee immunity, is the mutuality of immunity implicit in its provision. Stated another way, the amended language of § 25-5-11 denies a job-related injured employee the right to sue his negligent co-employee and for this he gains the right to negligently inflict an on-the-job injury to his fellow employee without the risk of suit.
The mutuality of immunity factor relied upon by some courts is necessarily dependent upon the totality of interest (or enterprise) concept. It is evident that these courts are not saying, apart from the employer's obligation to pay compensation, that mutuality of immunity as between co-employees, of itself, would support its constitutionality. This point may be further dramatized by applying the same test to the original statutory scheme between employer and employee. If the original Workmen's Compensation Act had provided mutual immunity from suitthat is, if the employer's only obligation in return for its immunity was not to sue its employeesas its only exchange of benefits and obligations between the affected parties, unquestionably, the Act would not have withstood a § 13 attack. See Chapman v. Railway Fuel Co., 212 Ala. 106, 101 So. 879 (1924).
I do not interpret Jadosh and Mier as so holding. These Courts simply look to the employer's obligation as an element within the total, overall statutory scheme and find sufficient offsetting benefits and obligations to constitutionally justify the co-employee immunity. My high regard for these Courts, however, does not persuade me to overrule Grantham. If § 13 is to retain any field of operation as organic law, the quid pro quo test to which this Court is committed, cannot be so loosely applied as to sanction the abolition of a fundamental right of redress on broad grounds that the substituted remedy consists in the prescribed obligations of a third party.
I reaffirm Grantham's insistence that the quid pro quo be measured in relationship to the affected parties. Here, the mutuality of immunity between co-employees, as the only exchange of obligations and benefits, falls far short of that test. Moreover, Grantham accords with our fault-based reparation for injury concept.
As noted by Professor Larson:
"... social policy has dispensed with fault concepts to the extent necessary to ensure an automatic recovery by the injured workman; but the disregard of fault goes no further than to accomplish that object, and, with payment of the workman assured, the quest of the law for the actual wrongdoer may proceed in the usual way." 2A Larson's Workmen's Compensation Law, § 71.10 at 14-2.
Any legislative attempt to abolish this fundamental right is suspect under § 13; and, generally, if challenged, such legislation will be invalidated unless the substituted remedy in favor of the injured party imposes commensurate obligations upon the party otherwise accountable for his culpable conduct.
I next address the individual Defendants' alternative insistence that we validate the statutory immunity provision exempting from co-employee suits those defendants employed in supervisory capacities. I acknowledge that Jones v. Watkins, 365 So.2d 1144 (Ala. 1978), contains language, albeit dictum, that may be interpreted as supporting Appellants' contention. Jones v. Watkins' reference to a functional test suggests that an executive officer, depending upon the nature of his alleged activities, may avoid the absolutism of Grantham and enjoy the explicit immunity provisions of the Act. Jones, of course, did not so hold; and *344 I expressly reject any dictum implying a distinction, for immunity purposes, between supervisory and nonsupervisory employees of a common corporate employer. Within the corporate employment structure, both classifications of employees are parties "other than the employer." Ford v. Mitcham, 53 Ala.App. 102, 298 So.2d 34 (Civ. App.1974); Comment, "Election and Co-employee Immunity Under Alabama's Compensation Act"; 31 Ala.L.Rev. 2, 21 (1979).[1]

II.

The Workmen's Compensation Insurance Carrier Immunity
I now address Fireman's Fund's contention for constitutional validity of the employer's workmen's compensation insurance carrier immunity. The carrier summarizes its strongest argument as follows: "Under the State's police power, the Legislature may pass reasonable measures incidentally affecting personal rights, in order to eradicate a perceived social evil or attain a perceived social objective."
Counsel's brief fairly and accurately analyzes Grantham's holding thusly:
"In rejecting co-employee immunity from suits by employees, Grantham relies not only on the Legislature's failure to provide an elective substitute remedy for enforcement of rights ... but also on the lack of a social objective invoking the Legislature's exercise of the State's police power. In holding co-employee immunity unconstitutional, Grantham notes:
"`Enactment of the Workmen's Compensation Act may provide an elective substitute for the remedy of enforcement against the employer in governance of the relationship of employer-employee. It may not deprive the injured employee of rights against the co-employee, the actual wrongdoer for it offers no elective substitute remedy for enforcement of these rights. Nor is there any perceived social evil to be eradicated by legislative exercise of the police power.' (Emphasis added.)"
From this analysis of Grantham, counsel conclude:
"Provisions granting workmen's compensation insurance carriers immunity, however, are a valid exercise of the State's police power in eradicating the evil of unsafe working conditions."
Citing as precedent Alabama State Federation of Labor v. McAdory, 261 Ala. 1, 18 So.2d 819 (1944), and Pickett v. Matthews, 238 Ala. 542, 192 So.2d 261 (1939), counsel reason:
"McAdory indicates an exercise of the police power is not rendered invalid by the fact that it affects incidentally the exercise of some right guaranteed by the Constitution, `but the police power may not unreasonably invade private rights guaranteed under the Federal or State Constitution.' Accordingly, `the test is whether the limitation imposed is really by way of regulation only and is one whose purpose and effect go no further than [to] throw reasonable safeguards in the public interest around the exercise of the right.'
"The obvious example of personal rights of individuals yielding to the police power is the guest statute. Pickett v. Matthews, 238 Ala. 542, 192 So.2d 261 (1939) [reaffirmed in Beasley v. Bozeman, 294 Ala. 288, 315 So.2d 570 (1975)], addresses the problem raised by this restriction of rights and recognizes that in such a context personal rights frequently yield to the general welfare:
"`The duty to use due care not to harm the person or property of another is of common law origin. It is therefore a right of property or of life and liberty safeguarded by the due process and other features of the Constitution, unless they yield to some power recognized to be superior in respect to the situation.
"`The police power sometimes is superior to such personal and property rights. They not infrequently yield to the general *345 welfare. Property itself is sometimes forfeited to the state when the legislature finds it necessary to the police protection of the people.
"`It is said to be well settled that the abolition of old rights recognized by the common law violates no such general feature of a Constitution, when such abolition is to attain a permissible legislative objective.' (Emphasis added.)"
I find the "social objective" criterion missing in Grantham is likewise missing in the instant case with respect to the compensation carrier. Indeed, my re-examination of Grantham inclines my thinking, on a relative scale, more favorably to the co-employee position than to the compensation carrier's position with respect to the immunity issue.
The social objectives common to the employer-employee relationship, coupled with the identity of fault as between the parties for whom the Act affords immunity, were seriously considered as factors constitutionally justifying the co-employee immunity provision. On balance, however, I conclude that as between co-employees the statutory deprivation of the fundamental rights of redress guaranteed under the due process clause of § 13 outweighs "any perceived social evil to be eradicated by legislative exercise of the police power," and that the considerations supporting validity of the carrier's statutory immunity are even less compelling than those favoring co-employee immunity.
The immunity's social objective, justifying the legislative exercise of the State's police power, insists the carrier, is to eradicate unsafe working conditions. Implicit in this proposed concept is the notion that the implementing purpose of granting workmen's compensation insurance carrier immunity is to foster industrial safety, and that liability for injury-producing negligent discharge of its voluntarily assumed duty of plant safety inspections materially hampers this benevolent undertaking.
A typical statement of this view is found in Kotarski v. Aetna Cas. & Sur. Co., 244 F.Supp. 547 (E.D.Mich.1965):
"Insurance companies which engage in accident prevention work, the social desirability of which cannot be questioned, should be able to do so without incurring unlimited liability for failing to discover a hazard that some jury might think should have been discovered. If an insurance company can escape tort liability altogether by not making any inspections on the premises of the insured, but may incur unlimited tort liability by making some inspections, it more than likely will decline to make any, unless required to do so by statute. The ultimate losers will be workmen and their families."
This argument that compensation carriers need immunity to be encouraged to make safety inspections has been answered by a number of courts with the observation that the carrier's undertaking is not entirely motivated by altruistic considerations. The carrier itself benefits from the introduction of improved safety procedures as a result of reducing accident and injuries, thereby also reducing claims. See, e. g., Mays v. Liberty Mut. Ins. Co., 323 F.2d 174 (3d. Cir. 1963). In addition, it can be noted that compensation carriers advertise their safety programs as sales promotions, so it is not at all certain that carriers do not have enough self-interest at stake to continue their safety inspections even without immunity from tort liability. Indeed, there is no claim that the carriers awaited the enactment of the immunity amendment to commence their practice of performing plant safety inspections.
Beyond its unsubstantiated premise, the difficulty I have with this public policy argument is in its contradiction to the basic tenets of the common law fault-based tort system. The public policy argument made by compensation carriers, albeit somewhat simplified, is essentially that the public interest in greater safety will be advanced by absolving carriers from tort liability. This is contrary to common experience that accountability for culpable conduct promotes, rather than undermines, the public good.
*346 Inherent in our system of reparation for culpably induced injuries is the deterrent factor. While deterrence is more explicit in the punitive damages aspect of willful or wanton conduct, accountability for lack of due care likewise encourages, not discourages, responsibility. Special relationships, to be sure, are viewed under certain circumstances as justifying the modification of the requisite standard of care, but the elimination of liability has yet to be accepted as a substitute for a standard conducive to the exercise of a higher degree of care or for a resultant safer society.
The public policy argument is, in fact, two-sided. On the one hand, it is true that public policy would favor promotion of safety through safety inspections by insurance carriers, and would presumptively disfavor anything that would tend to discourage such efforts. On the other hand, public policy recognized the value of holding tortfeasors responsible for the consequences of their wrongs. The issue, then, becomes one of balancing policy considerations, which Professor Larson poses in the following query:
"Is the public interest in encouraging safety inspections by carriers so great that the public is willing to add to the carrier's own motives for this activity a further incentive in the form of immunity from normal liability for its negligence?"
2A Larson's Workmen's Compensation Law, § 72.90, at 14-60.
As noted by Larson, the issue is further complicated by examination of the underlying premise of the carrier's public policy argument: that some safety inspection, even one which does not rise to a standard of due care, is better than none at all. Though not without some merit, this contention, if not rejected outright, has already been commented upon by this Court:
"[N]o inspection at all is preferable to a negligent inspection." Beasley v. MacDonald Engineering Co., 287 Ala. 189, 198, 249 So.2d 844 (1971), citing Fabricus v. Montgomery Elevator Co., 254 Iowa 1319, 121 N.W.2d 361 (1963).
As Mr. Justice Holmes commented in the opening paragraph of his famous treatise, The Common Law, "The life of the law has not been logic; it has been experience."
I adhere to the view, which I believe comports with contemporary societal values, that to hold a person liable for his carelessness is to make him more careful. It is, indeed, a person's paradoxical nature to say to his neighbor, "If you will not hold me responsible for my misconduct, I will be more careful"; while, on the other hand, it is inherent in his nature to be more careful if he knows he will be held responsible. From this dual capacity for human excesses springs the time-tested fault-based system of reparation for injuryits fountainhead being the imposition of a duty to act prudently not to inflict injury to another, and its result being safer conditions for all of us. It is the wisdom of the law's stability that resists fashionable, yet unsubstantiated, substitutes for the experience of the ages; and § 13 of our State Constitution is the granite stone mandate for such resistance.
Unless, and until, evolving societal values repudiate the "responsibility for culpability" cornerstone of our legal reparation system, I reject any assumed social objective in the carrier immunity provision of the Act; thus, failing to find either the quid pro quo or the perceived social objective requisites, I concur in the holding that § 25-5-11, as it applies to the workmen's compensation insurance carrier immunity, is unconstitutional.

III.

Co-employee Liability
Because of some apparent confusion, both as to the dutythe breach of which, if injury results, will support a claimand as to certain available defenses I now discuss the basis for liability of a co-employee. The mere fact that an employee has incurred a compensable injury under the Workmen's Compensation Act, resulting from an otherwise breach of the employer's duty, does not of itself mandate liability of any particular *347 co-employee. A third-party co-employee's claim of liability is subject to all the common law elements and defenses available in other tort actions. Liability can be imposed only for the breach of a personal duty owed the injured employee. The doctrine of vicarious fault (respondeat superior)which imposes liability upon the principal for the culpability of his agentdoes not operate in reverse to impose liability, as a matter of law, upon the agent (not even a managerial employee) for the employer's breach of a duty of due care to the co-employee.
It is not the servant's contract with his master which exposes him to, or protects him from liability to third persons. Liability does not arise from the existence of the relation of master and servant. The servant's liability arises from his breach of a duty owed to a third person under the law to use that which he controls so as not to injure another. 57 C.J.S. Master and Servant § 577 at 346; see, also, Smith "Common Law Liability of Supervisory Employee to Subordinate," 41 Ala. Lawyer 230, 238 (April, 1979).
Only where the employer, except for employer immunity, owes a duty of due care, the breach of which causes injury, and this duty is delegated by the employer to the co-employee defendant, or voluntarily assumed by him and the defendant breaches this duty through personal fault, can liability be imposed upon the co-employee. As in any negligence claim, the breach consists in the defendant's failure to discharge the delegated or assumed obligation with the degree of care required of a person of ordinary prudence under the same or similar circumstances.
Whether such failure or lack of due care is the result of misfeasance or nonfeasance is of no consequence (Carter v. Franklin, infra, 234 Ala. at 119, 173 So. 861), including the failure to act upon actual knowledge of foreseeable risk of harm to others or the lack of due care in failing to discover and avoid such risks of harm, resulting from the breach of the delegated or assumed duty with respect to such risk. When an agent has undertaken to act in the course of his employment, he will be liable for negligent performance of duties delegated to him by his employer; but, ordinarily, the employee is not responsible for failure to perform duties not delegated to him by his employer.
I repeat for emphasis: Liability of a co-employee must be predicated upon the breach of a personal duty owed to the injured employee and not upon general administrative responsibilities of the third-party co-employee defendant. It is insufficient, for example, to merely allege and prove a generalized duty of a co-employee to provide the injured employee with a reasonably safe place to work. An employee is not liable for injuries to another employee because of the failure of the employer to furnish a safe place to work or suitable appliances or instrumentalities. 57 C.J.S. Master and Servant § 578 n. 33, and accompanying text at 350.
The burden is upon the injured party to prove with specificity the defendant's delegated or assumed duty and its breach for which recovery is sought. The position he occupies, without more, cannot serve as a basis for a co-employee's liability.
The law is well summarized in Carter v. Franklin, 234 Ala. 116, 173 So. 861 (1937).
"... it cannot be questioned that in tort actions all persons are jointly and severally liable for the proximate results of their negligence or wanton conduct. The relation of employer and employee excuses neither. In some jurisdictions a mere day laborer acting under superiors is not held liable for acts of mere nonfeasance. This court has not approved such distinction. Whether his failure of duty be one of commission or omission is unimportant. But he must be a wrongdoer in such sort that under the particular facts of the case his negligence or wrongful act was a proximate cause of an injury." 234 Ala. at 119, 173 So. at 863.
The chief confusion concerning allowable defenses is focused upon the concept of the employer's "nondelegable duty" to provide a safe place of employment. Historically, this concept had its inception in the context *348 of the "fellow servant" doctrinean available defense under the common law in an employee's suit against his employer. Under the fellow servant doctrine, an employer could not be held liable for a violation of a duty owed to his employee if the performance of such duty was delegated by the master to a fellow employee of the injured plaintiff and the master had exercised due care and diligence in making the delegation. Tyson v. The South & North Alabama R. Co., 61 Ala. 554, 32 Am.Rep. 8 (1878); 53 Am.Jur.2d, Master and Servant, § 302, at 331. Such delegation, exercised with due care, absolved the master of the performance of the duty and, consequently, insulated him from personal liability for the breach thereof. Lovell v. DeBardelaben Coal & Iron Co., 90 Ala. 13, 7 So. 756 (1890).
The harshness of this doctrine prompted the courts to carve out special sets of circumstances in which the employer could no longer escape responsibility by transposing to a fellow worker of the injured employee the exclusive fault resulting in the injury. It was held that the duty of a master to furnish a reasonably safe work place for his servants was a personal duty which could not be delegated. Foreman v. Dorsey Trailers, 256 Ala. 253, 54 So.2d 499 (1951); Woodward Iron Co. v. Nunn, 205 Ala. 543, 88 So. 659 (1921); Woodward Iron Co. v. Boswell, 199 Ala. 424, 75 So. 3 (1917); Chamberlain v. Southern Railway Co., 159 Ala. 171, 48 So. 703 (1909).
The instant individual Defendants, with some supporting authority, contend that this concept prevents the employer's delegation of those very duties which they are charged here with failing to perform. Because this duty rests upon the employer and is nondelegable, the supervisory co-employee Defendants claim they cannot be charged with a breach thereof.
This is a misconstruction of "nondelegable duty." This concept is grounded upon the notion that certain duties owed by an employer to his employees are so inherent and fundamental to the employer/employee relationship that the employer cannot escape liability to an injured employee resulting from its breach by delegating its performance to other employees and then seeking refuge in the "fellow servant" defense. It does not mean the duty in fact cannot be delegated. Indeed, within the corporate employment structure, it can be discharged only through its delegation to persons other than the employer.
"Nondelegable duty," then, means that duty for the breach of which the master, despite its delegation to others, is liable for resultant injuries to the employee. Otherwise, the "fellow servant" rule charges the injured employee with his co-employee's negligent performance of this delegated duty, thus insulating the employer from liability . This "nondelegable duty" concept, when applicable, imposes separate and several liability upon the employer and the tortfeasor employee in a claim by a co-employee whose injury results from the breach of such duty.[2]
The relation of employer and employee (apart from the employer immunity) excuses neither from joint and several liability for proximate results of their negligent or wanton conduct. Carter v. Franklin, 234 Ala. 116, 173 So. 861 (1937), cited in 57 C.J.S. Master and Servant § 579 n. 46, at 352. To be sure, this concept, when invoked, inures to the benefit of the injured employee, cancelling the "fellow servant" defense otherwise available to the employer; but it has no field of operation in the context of a co-employee third-party action.
The traditional common law defenses of "fellow servant" and "assumption of risk" are not available to the co-employee defendant. These relatively latecomers to the law of tortspeculiarly the by-products of the industrial revolutionhad as their avowed purpose the protection of the master against an onslaught of tort actions by injured employees. The "greater good" inherent in a thriving, expanding industrial society was perceived as justifying the denial of individual employee recovery for the *349 injury and death wrought by the production lines in the new "age of machinery."
Indeed, the reluctance of the common law to ameliorate the harshness of these defenses combined with their older cousin, contributory negligencegenerated the social pressures that culminated in the passage of Employer Liability Acts and Workmen's Compensation Acts. Throughout the evolvement of these defenses, however, their application (other than for the application of contributory negligence) has never been extended beyond the master-servant relationship context.

IV.

Compensation Carrier's Liability
Next, I turn to the criteria for liability of the insurer. Although a complex question, it nevertheless lends itself to traditional tort analysis. Was there a duty? If so, what was the scope of that duty? Was that duty breached? Was there damage or injury? Was the injury proximately caused by that breach?
Whether a carrier has any duty concerning the safety of the work place depends upon the individual circumstances in each case. One must look to duties assumed by contract and duties assumed voluntarily. Where the duty is contractual, the scope of such duty is usually defined by the terms of the contract and the subsequent conduct of the parties pursuant thereto. It is in the voluntary undertaking where the parameters of the duty must be established through close scrutiny of the circumstances. This issue will generally be a question of fact.
The rule is well established that common law liability to third parties can arise from the negligent performance of even a voluntary undertaking. Beasley v. MacDonald Engineering Co., 287 Ala. 189, 249 So.2d 844 (1971); Parker & Brothers v. Hodgson, 172 Ala. 632, 55 So. 818 (1911); Coggs v. Bernard, 2 Lord Raymon 909. As was stated by Mr. Justice Cardozo and quoted in Beasley, 287 Ala. at 193, 249 So.2d at 847:
"`... It is ancient learning that one who assumes to act, even though gratuitously, may thereby become subject to the duty of acting carefully, if he acts at all.'" Glanzer v. Shepard, 233 N.Y. 236, 135 N.E. 275 (1922).
In defining the nature of the duty undertaken by a voluntary inspection, two aspects must be consideredthe physical scope of the undertaking and the degree of scrutiny and action mandated by conditions observed or reasonably observable. Both the actual physical area required to be inspected in a reasonable survey of the premises and the appropriate action to be taken by the inspecting party as a result of the survey must be determined to establish the standard of care which the inspecting party must observe in order to discharge its duty. This standard of care requires that the area inspected be of such a size and nature as to constitute a representative sampling of the work place, that the inspection be done with reasonable care, that hazards observed and appreciated, or which should have been observed and appreciated, be reported with the promptness commensurate with the degree of danger perceived or which reasonably should have been perceived; and that any corrective action within the inspector's ambit of authority or within the scope of its undertaking be instituted with appropriate haste.
Section 324A, The Restatement 2d of Torts, states:
"One who undertakes gratuitously or for consideration to render services to another which he would recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if
"(a) his failure to exercise reasonable care increases the risk of such harm, or
"(b) he has undertaken to perform a duty owed by the other to the third person, or
"(c) the harm is suffered because of reliance of the other or the third person upon the undertaking."
*350 The Restatement recognizes that if a duty exists and is breached, then, liability may be found if this breach increases the risk of harm to a third person and such harm occurs as a proximate result therefrom. In making this determination, the finder of fact must proceed on the assumption that persons with a duty to act will act reasonably. Therefore, consistent with the principles of joint tortfeasor liability, one cannot assume that an employer would fail to correct hazards reported pursuant to a diligent inspection, and, thus, through such an assumption, exonerate an inspecting party which has failed to discharge its duty.
Conversely, the inspector may be relieved of liability by discharging its duty as described herein whether or not the employer fails to act on the results of the inspection and injury to a third party occurs. The test is whether the conduct of the carrier rises to the level required of it, under the particular circumstances and according to the undertaking assumed, thereby discharging its duty and relieving itself of liability.[3]

V.

Conclusion
Upon a detailed review of the evidence in this case, I concur in the majority opinion affirming the trial Court on the issue of liability as to each of the Defendants other than the individual Defendant Shelby Bryan. The judgments against each of the Defendants (except Shelby Bryan), when tested against the applicable standards of liability set out in this special concurrence, are amply supported by the evidence of record.
SHORES, Justice (concurring in the result):
I concur in the result of the majority opinion to reverse and render as to the individual Defendant Shelby Bryan, to affirm the judgments on the issue of liability as to each of the remaining Defendants, and to remand these causes to the trial court for reassessment of the damages. Also, I concur with those portions of the special concurrence by Mr. Justice Jones, treating the liability standards for co-employees and compensation carriers in third-party actions arising under § 25-5-11, Ala. Code 1975.
For the reasons discussed herein, I would not overrule the result reached in Grantham. Further, I would extend that holding to invalidate the immunity provisions of Code 1975, § 25-5-11, relating to compensation insurance carriers. However, a reexamination of the subject, aided by the excellent briefs provided by counsel, has convinced me that Grantham's interpretation of Art. I, § 13, of the Constitution of Alabama is in implicit conflict with earlier pronouncements of this Court on the meaning and scope of § 13. Because I fear that this conflict has grave and perilous implications for the operation of stare decisis, for the development of constitutional doctrine in Alabama, and for the carefully calibrated balance of power between legislature and judiciary, I can no longer agree with the rationale on which Grantham was founded. I find firmer footing for its holding in the Court's traditional interpretation of § 13.
The text of § 13 is brief, but it is among the most fundamental of the guarantees against governmental oppression embodied in our state constitution. It reads:
That all courts shall be open; and that every person, for any injury done him, in his lands, goods, person, or reputation, shall have a remedy by due process of law; and right and justice shall be administered without sale, denial, or delay. [Emphasis added.]
The language of the provision is not unique. Thirty-seven other states include a similarly-worded provision in their constitutions, A. E. Dick Howard, The Road from Runnymede, Appendix; indeed, its origins can be traced back to the Magna Charta. 2 Coke, Institutes, Cap. 29, p. 56. Although its language *351 is broad enough to be subject to varying interpretations, it can generally be said to incorporate into our constitution a fundamental principle of fairness, a perhaps vaguely conceived but important notion of limitation on the power of government to infringe upon individual rights, and to act arbitrarily. What those rights are, what degree of infringement is permitted, and with how much justification, are inquiries which have been the subject of long-standing debate, and have puzzled minds more perspicacious than mine. Underlying all of these inquiries is the oft-unstated but all pervasive question of who is to answer them: legislature or courts? How do courts supply content to the provision without overstepping their traditional role and legislating themselves? The answers to these questions are important, for too literal a reading of the prohibitions of § 13 may effectively preclude governmental action in areas of crucial public concern; too broad a reading eviscerates the very rights the section was intended to protect.
Recent decisions of this Court on the subject, and recent proposed revisions of the Alabama constitution have elevated § 13 to an unprecedented level of legal interest. Legislation in many areas other than workman's compensation has been challenged as being unconstitutional under this section. In the past term of the Court alone, we have been asked to determine the applicability of § 13 to a statute of limitations governing breach of implied warranties which begins to run on the date of sale rather than of injury, Mayo v. Rouselle Corp., 375 So.2d 449 (Ala.1979); to a statute of limitations on medical malpractice liability, Street v. City of Anniston, 381 So.2d 26 (Ala.1980); and to our automobile guest statute.
Thus, any revision of existing doctrine in this area has ramifications far beyond the holding in any individual case. If, indeed, we are to revise, it must not be by implication, but after a careful consideration of the full consequences of the decision to other areas of the law.
Our previous cases interpreting § 13 have followed sometimes divergent analytical paths in attempting to delineate the rights preserved by the section. Not all can be reconciled, nor have they all stated the same test for determining when a violation of § 13 has occurred. In broad outline, however, two general approaches can be discerned.
The first, and earliest approach may be called the "vested rights" test, which received its most coherent expression in the 1939 case of Pickett v. Matthews, 238 Ala. 542, 192 So. 261 (1939). Pickett held that § 13 preserved an individual's cause of action once it had accrued, but did not prevent the legislature from changing existing duties, and thus abolishing causes of action before their accrual.
[W]hen a duty has been breached producing a legal claim for damages, such claimant cannot be denied the benefit of his claim for the absence of a remedy. But this provision does not undertake to preserve existing duties against legislative change made before the breach occurs. There can be no legal claim for damages to the person or property of any one except as it follows from the breach of a legal duty.
Pickett, supra, at 545, 192 So. at 263. An example of legislative action permissible under this formulation is provided in Pickett itself, which upheld a so-called "guest statute" allowing recovery by a non-paying passenger in a motor vehicle against the operator only where the passenger was injured by the operator's wanton or wilful misconduct rather than by his negligence. This effectively lowered the standard of care required of the operator and deprived the injured passenger of a cause of action for injuries caused by negligence.
While this approach certainly provides maximum latitude to the legislature and continues to be followed, most recently in Mayo v. Rouselle Corp., supra, it is not apparent that this provides any more protection to an injured individual than an ex post facto clause. It can be said to express a positivist theory of jurisprudence, a motion *352 that there are no rights other than those provided by the legislature. But if this were all that § 13 guaranteed, there would be no need for its inclusion in the constitution; Art. I, § 22, prohibits ex post facto bills.
The second approach utilized will be referred to as the common-law rights approach, and was most dramatically stated in Grantham. This test focuses on the protection of existing common-law rights and remedies, and perceives the role of § 13 as preserving those rights against legislative abrogation or modification except in limited circumstances. While this formulation provides more content for § 13, mechanical application of it can lead to such formalistic distinctions as that made in Slagle v. Parker, 370 So.2d 947 (Ala.1979), a post-Grantham case which held that the legislature could abolish wrongful death actions against co-employees in the workman's compensation context because that cause of action was created by the legislature and did not exist at common law. Although the common-law rights approach affords greater protection to individual rights than does the vested rights theory, I believe that in Grantham it was applied as too rigid and automatic a curb on the legislature's power. The frustration of legislators attempting to execute their duties within such inflexible constraints is evidenced by recent proposals to amend § 13.
Thus, while I believe that Grantham's result was correct, and its conception of § 13 essentially sound, though overly rigid, I find it necessary to elaborate my views on the protection afforded by § 13 and the role of the courts in enforcing it, so that § 13 not be perceived as an absolute prohibition on legislative action.
At the outset of any such inquiry, the rights protected by § 13 must be clearly identified. In this we are guided by the language and history of the section: "every person, for any injury done him ... shall have a remedy by due process of law...." The rights guaranteed include those possessed at common law by individuals injured by wrongful acts of others, and their redress must be sought through the courts. For it is said in 2 Coke, Institutes, Cap. 29, p. 56, when discussing that section of the Magna Charta that has evolved into our § 13, that:
Rectum, right, is taken here for law ... and that which is called common right... is called Common law.... The law is called rectum, because it discovereth that which is tort, crooked, or wrong, for as right signifieth law, so tort, crooked, or wrong, signifieth injurie.
An example of legislation which would be subject to challenge under § 13 is a statute providing that an injured person's cause of action against a professional for injuries caused by professional negligence be submitted to an arbitration board rather than a court. Although the injured person's substantive rights are not thereby altered, their enforcement through the courts is limited. In recognition of this constitutional restraint, the legislature found it necessary to further amend the constitution to authorize adoption of arbitration statutes in Alabama, Art. IV, § 82, Constitution of Alabama.
Legislation which abolishes or alters a common-law cause of action, then, or its enforcement through legal process, is automatically suspect under § 13. It is not, however, automatically invalid. Grantham itself restates the established rule that such legislation will survive constitutional scrutiny if one of two conditions is satisfied:
1. The right is voluntarily relinquished by its possessor in exchange for equivalent benefits or protection, or
2. The legislation eradicates or ameliorates a perceived social evil and is thus a valid exercise of the police power.
I find it helpful to think of these alternatives as two different aspects of the quid pro quo concept: Thus, a right may be abolished if the individual possessor receives something in return for it (the individual quid pro quo dwelt upon in Grantham), or if society at large receives a benefit (thereby justifying exercise of the police power).
*353 The issue then becomes: Who is to determine whether these conditions have been met, the legislature or the courts? As a general rule, this Court shows great deference to legislative enactments, striking them down only if no reasonable relationship can be perceived or imagined between the statute's goals and the methods used to achieve them.
[I]n passing upon the constitutionality of a legislative act, the courts uniformly approach the question with every presumption and intendment in favor of its validity, and seek to sustain rather than strike down the enactment of a coordinate branch of the government. All these principles are embraced in the simple statement that it is the recognized duty of the court to sustain the act unless it is clear beyond reasonable doubt that it is violative of the fundamental law....
Another principle which is recognized with practical unanimity, and leading to the same end, is that the courts do not hold statutes invalid because they think there are elements therein which are violative of natural justice or in conflict with the court's notions of natural, social, or political rights of the citizen, not guaranteed by the constitution itself. Nor even if the courts think the act is harsh or in some degree unfair, and presents chances for abuse, or is of doubtful propriety. All of these questions of propriety, wisdom, necessity, utility, and expediency are held exclusively for the legislative bodies, and are matters with which the courts have no concern. This principle is embraced within the simple statement that the only question for the court to decide is one of power, not of expediency or wisdom. [Emphasis added.]
Alabama State Federation of Labor v. McAdory, 246 Ala. 1, 18 So.2d 810 (1944). In short, the power of the legislature is plenary, except where limited by the constitution. Where legislation infringes upon a right protected by § 13, however, we are dealing with a limitation on the power of the legislature. By determining the validity of such legislation, we do not pass judgment on its wisdom, but follow our own supreme mandate to uphold the constitution of this state.
When examining statutes which have an impact on rights protected by § 13, then, our scrutiny must be sharper than that exercised in cases which involve no constitutionally guaranteed rights. While the legislature must make the initial determination that the benefits provided by a statute to society or to the injured individual justify the infringement on common-law rights, we must exercise a meaningful review of that decision. Is the individual's election actually voluntary, is the individual quid pro quo substituted by the legislation sufficient to ensure that voluntariness, is there any benefit to society at large to be achieved by such measures, and do the measures actually further the stated goals of the statute? These are questions which this Court can and does validly ask when the protection of § 13 is invoked by a party.
Of the dozens of cases decided under § 13, however, there are many which involve no deprivation of common-law causes of action, and in which the Court has declined to exercise a stricter than normal standard of review. In Leary v. Adams, 226 Ala. 472, 147 So. 391 (1933), for example, wherein the constitutionality of a zoning ordinance was tested under § 13, the Court noted that "[t]he authority for zoning laws is found within the bounds of the police power asserted for the public welfare." Such laws are to be upheld "if the validity of the legislative classification for zoning purposes be fairly debatable," and the task of the Court is to determine whether the ordinance "passes the bounds of reason and assumes the character of a merely arbitrary fiat." In this type of case, § 13 is construed as a general prohibition against arbitrary and capricious governmental action. The Court quite properly exhibits a high degree of deference to the legislative decision-making process in these situations because the guidelines for review are so vague. Where common-law causes of action for injury are impaired, however, the mandate of § 13 is explicit.
*354 To summarize, then, my view of the ultimate role of § 13 in our system of government: It does not merely prohibit the legislature from abolishing already accrued causes of action, nor does it immutably enshrine the common law beyond the reach of legislative attempts to adapt it to our evolving society and economy. It does prohibit governmental action which is arbitrary and capricious, while allowing the legislature much latitude in drafting laws. But most importantly, it sets up a dual system of review which acts as a cautionary brake when a change in the common law is contemplated. In effect, § 13 says that the rights enjoyed at common law by individuals are of such fundamental importance in our legal system that they must be changed, if at all, only after careful consideration by both legislature and courts.
It is clear that this approach is in direct conflict with the rationale of Pickett v. Matthews, supra, and other cases which have followed the vested rights theory. I suggest that we frankly and explicitly abandon the rationale rather than permit two inconsistent lines of cases to co-exist uneasily. Abandonment of the Pickett rationale will not necessitate overruling the result reached in the cases which have followed it because, in most of them, the legislation sustained under the less stringent Pickett test would also pass muster under the test here articulated. The guest statute challenged in Pickett, for example, is clearly a valid exercise of the police power. And Henley v. Rockett, 243 Ala. 172, 8 So.2d 852 (1942), the case which upheld a statute abolishing the common-law actions for alienation of affections and criminal conversation, is explicitly based on a perception that evolving mores had rendered those causes of action obsolete and of no benefit to society.
It remains only to articulate my objections to Grantham. While the majority opinion in that case exhaustively discussed the individual quid pro quo issue, from the points of view of both voluntariness and of sufficiency, it dismissed the possibility of the immunity provision being a valid exercise of the police power with a single sentence: "Nor is there any perceived social evil to be eradicated by legislative exercise of the police power as was the case regarding our motor vehicle guest statute. (§ 95, Tit. 36, Code 1940; § 32-1-2, Code 1975)." While this conclusion is, perhaps, ultimately correct, the issue, I believe, deserved a more serious consideration. To perfunctorily dismiss it could leave the impression that the justification the legislature must demonstrate in enacting a statute which abrogates common-law rights is too heavy. A fuller discussion of the issue would have pointed out the factors which led to the decision that invocation of the police power was unjustified, and suggested to the legislature ways of accomplishing its goals without violating § 13. As Grantham now stands, legislators may conclude that § 13 bars any statutory effort to extend immunity beyond the employer and, therefore, attempt to achieve that goal by amending that provision of the constitution. I do not believe that a constitutional amendment is required.
Further, I believe that Grantham erred by concentrating too exclusively on the protection of common-law rights and remedies. To hold that Section 13 protects only such rights is to ignore the dozens of cases decided under the provision which involve infringement of other rights, such as the right to conduct a legitimate business or to be free from arbitrary and capricious government. While a discussion of the appropriate standard of review for this Court to exercise in reviewing legislation which infringes on these rights is beyond the scope of this opinion, a comprehensive exposition of § 13 must include situations of this sort.
In short, I believe that we must return to the constitutional test articulated, although not applied, in Grantham. While the test may not dictate the result in any given case, it provides a principled basis for constitutional decision-making.
ALMON, J., concurs.
EMBRY, Justice, concurring specially:
I concur with the opinion of Justice Faulkner and I would extend Grantham to *355 hold that the immunity provisions relating to workmen's compensation insurance carriers found in the 1975 Code are invalid.
Additionally, I would now retract the dicta authored by this writer in Jones v. Watkins, 364 So.2d 1144 (Ala.1978), relating to the question of immunity of officers, directors, etc. from suits by injured employees of the corporation turning on the nature or function of the work being performed by the officer or director, etc. In other words if the employer be a corporation then it, and only it, would enjoy employer immunity.
One further observation: The "vested rights" test referred to in Pickett v. Matthews, 238 Ala. 542, 192 So. 261 (1939), was not the basis for the holding in that case and this court should have so stated in Grantham. That test should have been repudiated in Grantham and it should have been clearly stated that Pickett was based on the exercise of the police power which gives the legislature the inherent right to ascertain and determine when the welfare of the people demands that this power be exercised to eradicate perceived social evils as was done, for example, to abolish actions for breach of promise to marry, and actions for alienation of affection, etc.
BEATTY, Justice (dissenting):
We are once again confronted with issues emanating from that judicial "tar baby," Grantham v. Denke, Ala., 359 So.2d 785 (1978). The continuing necessity for explaining that opinion and the explanations themselves have convinced me that the time has come for this Court to recognize and candidly admit that it erred in Grantham v. Denke, supra, in holding that immunity provisions of the Workmen's Compensation Act are unconstitutional under Section 13 of the Alabama Constitution of 1901. Because it has come to my attention that the subject of immunity, as extended to the persons specified in Code of 1975, § 25-5-11 and § 25-5-53, has been held by the U.S. Supreme Court not to violate the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution, I am compelled to dissent.
At the outset it should be noted that my sole reason for dissenting at some length in this case is my desire that the questions here presented be resolved on the basis of sound legal doctrine. Adherence to established principles of law is a necessity in a case such as the instant case, for the issues before use are of fundamental importance to the integrity of our democratic system of government which is based upon the existence of three branches. Our continuing review of the workmen's compensation immunity provisions demonstrates that only two questions are posed:
I. Do the statutes violate Section 13 of the Alabama Constitution of 1901?
II. Do the statutes violate any other provisions of the state or federal constitution?
I have concluded that both questions should be answered in the negative. As a result, all that remains is the plenary power of the legislature.

I
In its pertinent part Section 13 of the Alabama Constitution of 1901 provides:
[E]very person, for any injury done him in his lands, goods, person, or reputation, shall have a remedy by due process of law....
Section 13 does not focus upon any particular remedy, nor does it speak of remedies against specific parties. The essence of the provision is, instead, that an individual is entitled to a remedy for his injuries. Accordingly, a legislative enactment should withstand a Section 13 attack if some remedy is provided a plaintiff for his injuries. See Mier v. Staley, 28 Ill.App.3d 373, 329 N.E.2d 1, 8 (1975). Under the Alabama Workmen's Compensation Act, an injured worker is clearly given a remedy for injuries sustained due to accidents "arising out of an in the course of his employment." Code of 1975, § 25-5-31. Although an injured worker is not given a right of action for job-related injuries against all persons (see Code of 1975, §§ 25-5-11, 25-5-53), the undeniable fact remains that "a remedy" *356 does exist for all injuries of which "the actual or lawfully imputed negligence of the employer [was] the natural and proximate cause." Code of 1975, § 25-5-31. That remedy is, of course, the right of the employee to recover workmen's compensation benefits. That an action for negligence will not lie against a co-employee or an insurance inspector is simply irrelevant under Section 13, for "a remedy" is always provided the injured employe covered by workmen's compensation. The immunity provisions of the Workmen's Compensation Act should therefore be held constitutional under Section 13.
As the foregoing discussionas well as my dissent in Slagle v. Parker, Ala., 370 So.2d 947, 951 (1979)indicates, I disagree fundamentally with the method by which the majority of this Court analyzed Section 13 in Grantham v. Denke, supra. The quid pro quo or "severability of interest" analysis is plainly inadequate as the test of a statute's constitutionality under Section 13 of our Constitution. The Workmen's Compensation Act, as amended, clearly was intended to create a compensation system which would shift the financial burden of industrial accidents from the injured employee to the employer. See Pow v. Southern Construction Co., 235 Ala. 580, 180 So. 288 (1938). In short, our statute is based upon the principle of enterprise liability. By focusing upon selected aspects of the Workmen's Compensation statute by means of the quid pro quo test, this Court has ignored a basic purpose of the Act as a whole. The Act is an enterprise system; why not interpret it accordingly? No satisfactory explanation is offered to demonstrate why we are committed to quid pro quo. Although that doctrine does possess a surface appeal, its application in the constitutional context is unwarranted under the clear language of Section 13 and appears to be unprecedented in our decisions before Grantham. Through the unjustified imposition of the quid pro quo concept onto Section 13, this Court has found certain of the workmen's compensation immunity provisions unconstitutional due to inadequacy of the "consideration" that passes under the Act between the immunized party and the injured covered employee. A contract would not, in the absence of special circumstances, be held invalid for inadequacy of consideration (e. g., Colburn v. Mid-State Homes, Inc., 289 Ala. 255, 266 So.2d 865 (1972)). Surely a legislative enactment should be entitled to at least the same dignity of treatment.
In Grantham v. Denke, supra, this Court impliedly held that because of Section 13, a common law cause of action may be statutorily abolished only if (1) there is a substantial quid pro quo between the parties whose remedies are altered, of if (2) there is a perceived social evil to be eradicatedor a perceived social objective to be attained by the legislative exercise of the police power. It is evident from a reading of Pickett v. Matthews, supra, that the Court did not at that time consider the "police power considerations" even to be relevant to a determination of constitutionality under Section 13. Instead, the extent of the legislature's power to legislate for the general welfare was addressed only in the context of the constitutional provisions guaranteeing equal protection of the laws and prohibiting the deprivation of inalienable rights without due process of law. Before Grantham the "perceived social evil" criterion was not thought be appropriate in the analysis of a statute under Section 13 of the Constitution. Because the majority now is presumably as committed to the "perceived social evil" test as it is to the quid pro quo standard, a few words upon the Court's prior decisions dealing with the extent of the police power are in order.
The legislature's exercise of the police power to combat social evil or to attain social objectives has previously been upheld against Fourteenth Amendment challenges if the law enacted bore a reasonable relation to a proper legislative purpose and was neither arbitrary nor discriminatory. See e. g., Alabama Dairy Commission v. Food Giant, Inc., Ala., 357 So.2d 139 (1978).
Pickett v. Matthews, supra, viewed the legislative abolition of a common law cause of action to be a valid exercise of the police *357 power "when such abolition [was] to obtain a permissible social object." 192 So. at 264. (Emphasis added). In part because the Court was able to perceive that the guest statute was directed at the eradication "of what the Legislature may regard as an evil" (i. e., the multiplicity of suits growing out of the gratuitous carriage of passengers in automobiles), the statute was upheld. If adhered to in this case, the Pickett standard would compel the conclusion that the immunity provisions of the Workmen's Compensation Act are constitutional enactments designated to provide for the general welfare.
The limitations upon the legislature's exercise of the police power are few; as was said in Alabama State Federation of Labor v. McAdory, 246 Ala. 1, 13, 18 So.2d 810 (1944):
[The police] power must not be exercised arbitrarily or capriciously, and there must be some reasonable relation to the regulation and the ends to be attained. But if upon the matter men may reasonably differ, in view of all the circumstances, the legislative act in the exercise of the police power must be sustained. [Emphasis added.]
Men may indeed reasonably differ upon whether these immunity provisions are rationally related to permissible state objectives; the widely divergent views of the members of this Court abundantly support that proposition. In view of our own "reasonable disagreement," it seems elementary that the statutes in question should be upheld on the police power ground.
One firmly ingrained principle of jurisprudence which seems to have been overlooked in Grantham and its offspring is the presumption favoring constitutionality. Alabama State Federation of Labor v. McAdory, supra. In McAdory, after noting the plenary power that is vested in the legislature, it was pointed out at 246 Ala. at 9, 18 So.2d at 815:
[I]n passing upon the constitutionality of a legislative act, the courts uniformly approach the question with every presumption and intendment in favor of its validity, and seek to sustain rather than strike down the enactment of a coordinate branch of the government. All these principles are embraced in the simple statement that it is the recognized duty of the court to sustain the act unless it is clear beyond reasonable doubt that it is violative of the fundamental law.
I question whether anyone could say that it is "clear beyond reasonable doubt" that the immunity provisions of the Workmen's Compensation Act violate Section 13 or any other section of our Constitution.

II
Dissenting in Slagle, supra, I expressed my opinion that the immunity granted to co-employees was not consonant with the object of the workmen's compensation legislation and therefore constituted an arbitrary classification. At that time, unfortunately, the equal protection issue had not been adequately treated either in brief or in argument. Additional research, however, has disclosed a United States Supreme Court decision which is controlling on the equal protection argument: Northern Pacific Railway Co. v. Meese, 239 U.S. 614, 36 S.Ct. 223, 60 L.Ed. 467 (1916). The Meese case was based upon an action for wrongful death brought by the widow of a covered brewery employee against a third-party railroad tortfeasor, alleging that his death was caused by the railroad's negligence. The cause of action arose in the State of Washington whose supreme court had interpreted Washington's (involuntary) Workmen's Compensation Act to substitute a new remedy for existing laws dealing with workmen's injuries. The appellant argued, inter alia, that this construction would conflict with the equal protection clause of the Fourteenth Amendment. That argument was rejected by the United States Supreme Court as being without merit, and so the power of the state legislature to make the substitution of remedies was preserved.
The purpose of the Alabama statute has not always been clearly expressed. Earlier cases had emphasized the relation of master and servant, suggesting the exclusion of *358 other relationships. Cf. Gentry v. Swann Chemical Co., 234 Ala. 313, 318, 174 So. 530 (1937), and Ford v. Mitcham, 53 Ala.App. 102, 104, 298 So.2d 34 (1974). Heretofore some of us have given too much emphasis to those expressions and not enough consideration to the language in those cases describing workmen's compensation as a substitute for existing remedies. In construing the present Act our attention should be upon the relationship between the classifications and the purpose of the 1975 Amendments. Those amendments clearly manifest a legislative intention to create a compensation system based upon the principle of enterprise liability. We are bound to apply the "plain meaning rule" to them. Caminetti v. United States, 242 U.S. 470, 37 S.Ct. 192, 61 L.Ed. 442 (1917); Sutherland Statutory Construction, § 46.01 (Sands ed.).
Consequently, our legislature's purpose corresponds with that explored in Meese, supra and, regardless of my contrary views, I am required to yield to the United States Supreme Court's finding that such a purpose does not offend the equal protection clause. That barrier having been removed, no other impediment interferes with the legislative power to create the statutory classification in issue, for as I have shown previously, Section 13 of our State Constitution inhibits legislative power upon accrued causes of action only. Slagle at 951-952.
If any is needed by purist souls, there is ample precedent for my change of position. In that connection, it is pleasing to recount the remarks of the eminent Mr. Justice Jackson in McGrath v. Kristensen, 340 U.S. 162, 177-178, 71 S.Ct. 224, 233, 95 L.Ed. 173 (1950) when he found himself concurring in an opinion contrary to a previous one of his own:
Precedent, however, is not lacking for ways by which a judge may recede from a prior opinion that has proven untenable and perhaps misled others. See Chief Justice Taney, License Cases, 5 How. 504, 12 L.Ed. 256, recanting views he had pressed upon the Court as Attorney General of Maryland in Brown v. State of Maryland, 12 Wheat. 419, 6 L.Ed. 678. Baron Bramwell extricated himself from a somewhat similar embarrassment by saying, "The matter does not appear to me now as it appears to have appeared to me then." Andrew v. Sytrap, 26 L.T.R. (N.S.) 704, 706. And Mr. Justice Story, accounting for his contradiction of his own former opinion, quite properly put the matter: "My own error, however, can furnish no ground for its being adopted by this Court * * *." United States v. Gooding, 12 Wheat. 460, 478, 6 L.Ed. 693. Perhaps Dr. Johnson really went to the heart of the matter when he explained a blunder in his dictionary"Ignorance, sir, ignorance." But an escape less self-deprecating was taken by Lord Westbury, who, it is said, rebuffed a barrister's reliance upon an earlier opinion of his Lordship: "I can only say that I am amazed that a man of my intelligence should have been guilty of giving such an opinion." If there are other ways of gracefully and good naturedly surrendering former views to a better considered opinion, I invoke them all.
Torbert, C.J., and MADDOX, J., concur.

ON REHEARING
FAULKNER, Justice.
On application for rehearing Fireman's Fund raises these principal issues:
1. Whether Fireman's Fund's negligent inspection (failure to discover and point out the dangerous condition created by the improper use of the flammable glue) was the proximate cause of the plaintiffs' injuries, and
2. Whether this court's affirmance of the trial judge's award of punitive damages was proper when the opinion failed to mention wanton conduct on the part of the defendant.

(1)
We opine that United States Fidelity and Guaranty Co. v. Jones, 356 So.2d 596 (Ala. 1978), controls the proximate cause issue. There, United States Fidelity and Guaranty, the workmen's compensation insurance *359 carrier, "was authorized (but not required) to perform certain safety inspections of the job site. It [was] undisputed that agents of U.S.F.&G. had performed inspections, approximately monthly, for several years prior to the injury made the basis of this suit."
Referring to the evidence, this Court stated: "The record is replete with evidence that U.S.F.&G. did inspect the premises on a periodic basis. The hole in the platform was within sight of anyone in the vicinity; therefore, there was evidence from which the jury could infer that the inspections were negligently performed." The jury found that the negligent inspection was the proximate cause of the plaintiff's injury and this Court stated that even "[t]hough it [was] apparent that Jones [the plaintiff] had knowledge of the hole, his appreciation of the danger of that opening, the voluntariness of his encounter with the danger, and his use of due care were issues properly submitted to the jury." This Court affirmed the jury's finding and held that the defendant's motion for directed verdict was properly denied by the trial judge.
Although Jones controls in the present case, there are two other cases within this jurisdiction which we feel must be distinguished. In each of those cases, Glover v. Silent Hoist and Crane Co., 471 F.Supp. 457 (N.D.Ala.1979), and Hughes v. Hughes, 367 So.2d 1384 (Ala.1979), the insurance carrier's employee had discovered and reported the hazardous condition to the plaintiff's employer as a consequence of the inspection, and prior to the injuries. In Glover the Court even noted: "It is highly relevant that Reynolds' safety engineers were aware of the danger inherent in the simultaneous presence of pedestrians and machines in certain areas of the plant and were making constant efforts to eliminate or minimize such danger." In Jones, as in this case, the insurance company's representative failed to discover the dangerous condition and bring it to the attention of the plant officials.
In Glover the court entered judgment for the defendant notwithstanding the jury verdict for the plaintiff, and in Hughes the court affirmed the trial court's grant of a directed verdict in favor of the defendant insurance carrier. Both courts based their results on the plaintiff's failure to introduce even a scintilla of evidence to show proximate cause.

(2)
As to the propriety of an award of punitive damages, this Court in Bradley v. Walker, 207 Ala. 701, 93 So. 634 (1922), quoting B.R.L.&P. Co. v. Wise, 149 Ala. 492, 42 So. 821 (1906), stated: "Punitive damages are not recoverable for simple negligence, but the recovery in such case is for compensatory damages." See also South and North Alabama Railroad Co. v. McLendon, 63 Ala. 266 (1879). Appellants, therefore, contend that the award of punitive damages under the circumstances of this case is contrary to the law in this jurisdiction. The following language from the original opinion forms the basis for their contention:
The trial judge as trier of fact, determined that Fireman's Fund was guilty of negligent inspection. We cannot, after examining the evidence, determine that he was plainly and palpably wrong.
Fireman's Fund asserts that because of the failure to mention "wanton" conduct in the original opinion, the Court has improperly allowed simple negligence to support punitive damages. The plaintiffs, however, alleged both negligent and wanton conduct in the complaint and the trial judge, as trier of fact, found in favor of plaintiffs and awarded them damages. The issue of degree of negligence is a question of fact to be determined by the trier of fact. See e. g., Alabama G.S. Railroad Co. v. Arnold, 80 Ala. 600, 2 So. 337 (1886). The trial judge, therefore, made the factual determination based upon the evidence presented at the trial and we affirmed, stating: "We cannot, after examining the evidence, determine that he was plainly and palpably wrong." The judgment of the trial court does not specify whether the damages were awarded on the basis of simple or gross negligence, nor does the judgment distinguish the damages as compensatory or punitive; therefore, *360 the failure to mention the concept of gross negligence in the original opinion does not necessarily preclude the possibility that the trial judge did indeed base his determination of liability on gross negligence. Fireman's Fund contends that "wantonness" is the standard necessary to support punitive damages and that because "the most crucial element of wantonness is knowledge," Roberts v. Brown, 384 So.2d 1047 (Ala.1980), negligence and wantonness cannot exist in the same act. This court has in fact held "that wantonness and negligence cannot exist in the same act ... and as a general rule, a verdict based in part on each of these is contrary to the law." Tombrello v. McGhee, 282 Ala. 408, 211 So.2d 900 (1968).
This Court has, however, also held "[t]hat... when negligence is so gross as to evince an entire want of care, and is sufficient to raise a presumption that the defendant, being cognizant of the probable consequences, is indifferent to the danger to which the persons or property of others may be exposed`a conscious indifference to consequences'exemplary damages may be awarded. It is not necessary that the injury shall be wilful." (Citations omitted). Alabama G.S. Railroad Co. v. Arnold, supra.

(3)
In their application for rehearing, defendants George Kennedy, Mark Holt, and Dave Logan raise the following issues: (1) factual error; (2) absence of proximate cause; (3) improper award of punitive damages; (4) failure of trial judge to hold a new trial proceeding in reassessing damages on remand; and (5) effect of opinion on management individuals as insurers of employees.
As factual error, these defendants assert that this Court's original opinion "clearly lead[s] one to believe that the individual defendants had actual knowledge of the use of spark producing electrical appliances in the work area wherein the accident occurred." The opinion, however, does not give this impression. In relating the evidence as contained in the record, the opinion points out that these individual defendants, by virtue of their positions, were responsible for providing a safe working environment for the other employees and that these defendants breached the duty of care arising from the responsibilities of their positions. There is no direct statement to the effect that each of these men had actual knowledge of the simultaneous use of the electric screwdrivers with the glue; rather, the opinion emphasizes that each defendant should have had knowledge (if he did not in fact have knowledge) of the hazardous conditions and that each defendant was aware that the simultaneous use of the glue and the electric screwdrivers was extremely hazardous.

(4)
We have discussed proximate cause in Item 1.

(5)
In asserting that the award of punitive damages was improper, these defendants base their contention on the following language of the opinion: "[T]he trial judge as trier of fact properly found that Logan had breached his duty of due care by personal fault, in failing to utilize with reasonable care the instrumentalities within his control so as not to injure his co-employees." They contend that this language means simple negligence; therefore, punitive damages are improper. The opinion, however, states that the evidence at trial established the defendants' knowledge of the hazardous nature of the glue and their (defendants') failure to properly warn the employees, or to discontinue use of the glue until the shipment of non-flammable glue on order could arrive. Then, as now, we opine that this evidence supports an award of punitive damages.

(6)
After remand of the case to the trial court for a new trial, only on the issue of damages, the judge entered judgments based on the evidence from the initial trial. We think that the judge miscontrued this Court's order of remand. Thus, the trial judge is again directed to hold a new trial on the issue of damages only. The original opinion sets out the elements to be considered *361 in arriving at the amount of damages. The judgments entered by the trial judge on August 21, 1980, and filed on August 22, are void because at that time this Court still had jurisdiction of the case. An application for rehearing had been filed on August 21. Moreover, a certificate of judgment was never issued by this Court pursuant to Rule 41(a), ARAP. (This Court by order dated December 4, 1980, granted a petition for writ of mandamus to set aside those judgments.)

(7)
The appellants contend that the trial judge should recuse himself; that a new trial would be meaningless if conducted by him. To this contention we state that there is no legal basis for the recusal of the trial judge presented in the application for rehearing. Moreover, the motion for permission to make post-judgment discovery (a motion apparently made to gather facts of some impropriety on the part of the trial judge) did not comply with Rule 27(b), ARCP, and was correctly denied by the trial judge.
Finally, a ground in the motion for new trial stated,
Defendants were denied equal protection and due process in that the Court allowed plaintiffs' attorneys to prepare judgment ex parte without notice to counsel for these defendants.
There is nothing in the record to support this ground. Defendants' counsel stated at the hearing on the motion, "We don't have anything on the motion for new trial. We just submit."

(8)
To the contentions of the appellants that the effect of the decision is to make management individuals insurers of employees and that the decision will have an adverse effect on the continued industrial development of this State, we answer that they are without merit.
On the issue of holding a new trial on the issue of damages, the application for rehearing is granted. On all other issues, the application for rehearing is overruled.
OPINION EXTENDED, APPLICATION FOR REHEARING GRANTED IN PART, OVERRULED IN PART; REMANDED TO THE TRIAL COURT FOR A NEW TRIAL ON THE ISSUE OF DAMAGES.
JONES, ALMON, SHORES and EMBRY, JJ., concur.
TORBERT, C.J., and MADDOX and BEATTY, JJ., dissent.
ADAMS, J., not sitting.
NOTES
[1] For a consistent holding in the context of a co-employee non-coverage clause in a public liability policy, see Home Indemnity Co. v. Reed Equipment Company, Inc., 381 So.2d 45 (Ala.1980).
[2] It must be remembered, of course, that the "non-delegable duty" concept is of common law origin and is operative only in nonworkmen's compensation contexts.
[3] Because of its inapplicability to the instant facts, discussion of § 324A(c), Restatement 2d of Torts, is pretermitted. See Hardie, "The Remains of Negligent Inspection in Alabama" (U.S.F.&G. v. Jones), 39 Ala.Law. 267 (1978).