STEAGALL, Justice.
William Earl Malone, Jr., and his wife, Cecelia S. Malone, appeal from a summary judgment in favor of defendants, J.R. Beg-gerly, A. Randolph Sommer, Jerry L. Stewart, C. Anderson Stubbs, and Robert Tin-dle, in their co-employee suit[1] for damages based on injuries William Malone[2] sustained on the job at Alabama Power Company’s Barry Steam Plant in Mobile County. Four other co-employee defendants are not involved in this appeal because the summary judgments granted for two of them were not appealed and the actions against the other two are still pending below.[3] Thus, our review is confined to the five defendants named above. The sole issue before us is whether a duty to provide Malone with a safe place to work was delegated to or assumed by any of those five co-employee defendants. Resolution of this issue necessitates reviewing each co-employee’s position and responsibilities at the Barry Steam Plant.
Beggerly had been the plant manager for the past eight years. Altogether, Beggerly had worked for 34 years in divers positions at the plant. As plant manager, Beggerly is in general charge of the entire plant’s operation and maintenance. He stated in his deposition that he provided safety meetings, “talked up” safety, made sure equipment was installed and operated safely, and in general made sure the premises were safe. He regularly attended the safety meetings and walked through the plant at least once a day, overseeing some of the work. If he saw a job being done in an unsafe manner, he would intercede and either instruct the workers on the correct method or call the problem to the attention of the immediate supervisor. In his testimony, he agreed that, as required by Alabama Power’s safety manual, before undertaking any job the supervisor and his workers should perform a “job analysis” to satisfy themselves that the work can be done safely. He also acknowledged that no such *1322 job analysis had been done prior to Malone’s accident.
Stewart had been the assistant plant manager for four years and had been employed by Alabama Power for the past 16 years. Stewart would walk around the plant, emphasizing to the employees that safety was utmost at the plant, and he would attend the safety meetings.
Sommer, retired as of 1986, had been an Alabama Power employee for 34 years. He was maintenance superintendent at the time Malone was injured and had been in that position about ten years. His job description required him to promote safe working practices and to be familiar with company safety procedures. In addition, he had the authority to stop unsafe work practices if he observed them while walking through the plant. Sommer was off on the day of Malone’s accident.
Below Sommer were Tindle and Stubbs, assistant maintenance superintendents, Tindle being in charge of the mechanical division and Stubbs being in charge of the electrical division. The maintenance foremen report directly to the assistant maintenance superintendents, and Tindle and Stubbs were responsible for seeing that the foremen reporting to them were complying with the company safety manual and that the foremen were ensuring that the journeymen below them were doing their work in a safe manner. Tindle would discuss safety problems with foremen and journeymen doing the work, and he had authority to stop any unsafe practice he observed. Stubbs was responsible for seeing that foremen performed job analyses, and he was aware of the work being done that caused Malone’s injuries.
On August 25, 1983, at about 7 a.m., Malone, along with another mechanical journeyman and an apprentice, was assigned to generating unit # 5 in the basement of the plant to rebuild a compressor. Henry Davis, the mechanical foreman, received a call from Leslie Boothe, the electrical foreman, inquiring how long the compressor would be out of service. Davis told him it would be three or four days, and Boothe told Davis that the electrical department was going to remove the compressor motor for cleaning and repair.
When Malone and his co-workers arrived at the air compressor room, Neil Simison, an electrician, and Robert Smith, an apprentice electrician, were working on the motor, which had been hoisted overhead and was attached to the monorail above. A turntable, which is a part of the monorail, allows a load to be moved from the monorail, and, after the turntable is rotated, to be moved along another monorail at a right angle. Loads move along the monorails by means of trollies, which have various lifting capacities ranging from ½ ton to 6 tons.
Because Simison and Smith were having considerable difficulty moving the motor from the turntable to an east/west monorail, Malone and the two men with him attempted to assist the electricians. On their fourth attempt to move the trolley from the turntable to the monorail, the trolley fell from the monorail. The motor fell, striking piping and a concrete slab, and bounced off the floor, striking Malone on the left side of his body. He suffered a comminuted fracture of the pelvis.
Undisputed evidence revealed that the trolley was capable of lifting 1,000 pounds, or ½ ton, and that this lifting capacity was indicated on the trolley itself. The total weight of the motor and other lifting equipment attached to it was 2,670 pounds. The weight of the motor was not displayed on it; however, a specification card kept in the plant indicated its weight. Thus, a trolley was used to lift a motor weighing more than twice the trolley’s capacity.
Two recent co-employee cases, Creel v. Bridewell, 535 So.2d 95 (Ala.1988), and Harris v. Hand, 530 So.2d 191 (Ala.1988), are pertinent to this case. In Creel, the summary judgment in favor of the defendant co-employee, Bridewell, a part owner of the company for which Creel worked, was reversed. Creel was injured when the machine into which he was hand-feeding plastic caught his arm and the emergency stop button failed to disengage the machine. It was the defect in the machinery that provided the basis for Bridewell’s lia *1323 bility, because the record contained evidence that Bridewell was familiar with the machine, that he had observed it in operation during inspections of the plant, and that he knew or should have known that it was defective and, therefore, posed a safety risk to his co-employees. We noted that “the record is devoid of any evidence tending to show that Bridewell retained a duty to provide Creel with a safe work place by ensuring his proper training,” and we noted:
“[T]he record substantiates Robert Bridewell’s testimony that other employees of [the company] were more directly responsible for giving safety instructions and making necessary changes to improve safety. However, the evidence indicating that certain duties involving safety training, instructing, and implementing changes had been delegated to others does not detract from the evidence manifesting Bridewell’s retention of a duty to provide Creel with a safe machine.”
Creel v. Bridewell, 535 So.2d at 98 (emphasis added). It was Bridewell who had examined the machine before buying it and who stated that “it appeared to be safe.” 535 So.2d at 97. Creel is distinguishable, both from Harris, supra, and from the instant case.
In Harris, the defendant Hand, president of the roofing company that employed Harris, was found not liable to Harris by virtue of his position alone, and the summary judgment in his favor was affirmed. Harris was injured when he fell from the ladder on which he was standing while working on a reroofing project.
The positions and responsibilities of Beg-gerly, Stewart, Sommer, and Stubbs are more aligned with that of Hand, who visited the job site two or three times a week, met with another employee to keep abreast of the work and learn what tools were needed and how the men were performing, and bought all of the tools, equipment, and supplies that were needed. We especially recognized that, although Hand admitted in his deposition that he was ultimately responsible for the safety of the work place, his position as president did not alone serve as a basis for liability.
While it is true that Beggerly, Stewart, and Sommer toured the plant, attended safety meetings, and were ultimately responsible for safety, that is insufficient, as it was with Hand in the Harris case, to establish a personal duty on their part to the plaintiff and is, thus, no basis for holding them liable to him. “A co-employee is not liable to another employee unless he (1) voluntarily assumed or (2) was delegated his employer’s duty to provide a reasonably safe work place. Fontenot v. Bramlett, 470 So.2d 669, 672 (Ala.1985).... ‘[T]he fact that a [co-employee] is in an administrative or supervisory position alone does not make that person liable.’ Clements v. Webster, 425 So.2d 1058, 1060 (Ala.1982).” Harris v. Hand, 530 So.2d at 192.
However, in contrast to Beggerly, Stewart, and Sommer, Stubbs had the responsibility of seeing that Boothe, the electrical foreman, performed a job analysis prior to lifting the motor, and yet Stubbs did not require one or check to see that the work in progress conformed to one. Viewing the evidence in the light most favorable to Malone, Creel, supra, it is apparent that there is at least a scintilla of evidence [4] not only that Stubbs owed Malone a duty to provide a safe work place but also that he breached that duty and that the breach was the proximate cause of Malone’s injuries. Clearly, but for the use of the wrong trolley, the motor would not have fallen.
On the other hand, we find no evidence that Tindle, who was superintendent of the mechanical division, either assumed or was delegated a duty to provide Malone with a safe work place in the context of removing the motor to perform electrical work. See Fireman’s Fund American Ins. Co. v. Coleman, 394 So.2d 334 (Ala. *1324 1981). Consequently, the summary judgment is affirmed as to Beggerly, Stewart, Sommer, and Tindle, but it is reversed as to Stubbs, and the case is remanded.
AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.
HORNSBY, C.J., and MADDOX, JONES, ALMON, SHORES, ADAMS, HOUSTON and KENNEDY, JJ., concur.

. William Malone’s injury occurred on August 25, 1983, prior to the effective date of Ala.Code 1975, § 25-5-11 (February 1, 1985).

. Because the wife’s claim is purely derivative, hereinafter "Malone” will refer to William Malone only.

.Summary judgment was entered for Henry Davis, the mechanical foreman, and Robert Smith, an apprentice electrician. Summary judgment was not requested by Neil Simison, the other electrician involved with the accident, and summary judgment was denied for Leslie Boothe, the electrical foreman.

. This case was filed August 2, 1984, and is, thus, governed by the "scintilla rule” rather than the "substantial evidence" test, which became effective June 11, 1987. See § 12-21-12, Ala. Code 1975.