339 So.2d 992 (1976)
BELOIT CORPORATION, a corporation
v.
Kenneth G. HARRELL, American Can Co., a corporation (Intervenor).
SC 1406.
Supreme Court of Alabama.
October 1, 1976.
*993 Lyons, Pipes & Cook, and Norton Brooker, Jr., Mobile, Hill, Hill, Carter, Franco, Cole & Black, Montgomery, for appellant.
Cunningham, Bounds, Byrd, Yance & Crowder, Mobile, Hardin, Stuart, Moncus & Noojin, Birmingham, for appellee.
JONES, Justice.
This 312 personal injury action[1] arose when the plaintiff's (Kenneth Harrell's) hands were caught by the in-running nips of a papermaking machine which was manufactured by the defendant, Beloit Corporation. Harrell's employer, American Can Company, paid workmen's compensation benefits and intervened as a party plaintiff.

THE FACTS
In late 1959, Beloit sold this papermaking machine to Marathon Paper Company who subsequently sold their operation to American Can Company. Shortly after the installation of the machine, an air chute was removed by American Can. The evidence is conflicting as to whether this chute was an automatic feeding device, although there seemed to be a general agreement that this device did not work properly on heavier grades of paper. Employees of American Can testified that the chute was removed because it did not work. American Can also removed certain doctor blades from the machine. While the evidence is conflicting as to the function of these blades, even Beloit's expert witness admits that they were not safety guards and that various problems occurred with respect to the operation of these blades. American Can employees testified that, just as in the case of the chute, the blades were taken off because they did not function properly.
This machine consists of wet and dry calendar stacks. The paper is threaded through various nip points between each roll in the calendars. The nip is the area between any two in-running rolls facing a *994 workman and is similar to a wringer-type washing machine.
Just prior to the accident a sheet of paper being processed broke and it became necessary to rethread the machine. Harrell went to a catwalk on the back side of the dry calendar with an air hose. The sheet of paper being rethreaded was thrown into the top nip and the paper began to wrap around the top roll instead of threading properly. Harrell was attempting to blow the paper off the roll with an air hose when his right hand became caught in the nip. He immediately attempted to pull out the hose with his left hand and it too was caught.
Harrell's injuries may be summarized as follows: On the right hand the thumb was denuded; the little finger was split from the tip to the palm; the denuded proximal phalanx was all that remained of the ring finger; the other two fingers were severed; and, during surgery, the metacarpals were shortened because they were no longer functional. On the left hand, the thumb was intact but a completely denuded index finger was the only finger remaining; and the metacarpals were also shortened during surgery. Each upper extremity was 95% permanently disabled which, according to the medical testimony, was translated into 75% Permanent partial disability to the body as a whole.
At the close of the trial, and after the jury had been charged, the plaintiff began making his exceptions to the charges. Whereupon, the Court recessed and the Judge did not allow Harrell to complete his objection and exceptions nor was Beloit allowed any opportunity to object or except. The trial Judge granted each attorney an exception to the entire charge that was submitted to the jury. A verdict was returned in favor of Harrell in the amount of $800,000.

THE ISSUES PRESENTED
Three primary issues are presented:
1) Beloit claims error in the denial of its motion for a directed verdict, asserting two separate contentions:
(a) that the sole proximate cause of Harrell's injuries consists in the acts of American Can in positioning Harrell on the catwalk and furnishing him with a rubber hose to thread the paper, coupled with the removal of the air chute and doctor blades.
(b) that Beloit owed no duty to protect Harrell because the conditions which caused the injuries were open and obvious and known by Harrell to exist.
The first primary issue (the denial of a directed verdict) in its two aspects, then, may be summarized:
(a) whether, as a matter of law, the modification of the machinery by American Can constituted sufficient intervening cause to absolve Beloit from liability;
(b) whether, as a matter of law, the open and obvious doctrine should have been applied.
2) Beloit urges that reversible error was committed by the trial Judge when Beloit was denied the right to make specific objections to the Court's charges before the jury retired, even though counsel was allowed to except to all charges given.
The second issue, then, is: whether the denial of the right to make specific objections to the trial Court's charge before the jury retired was reversible error even though the charges themselves were not erroneous.
3) Beloit urges this Court to find that the amount awarded Harrell as damages was so excessive that it clearly shows bias, prejudice or mistake and an abuse of discretion by the jury.

THE DECISION
I. The Directed Verdict Issue.
Under established Alabama law, in civil cases, the function of an appellate court in reviewing a motion for a directed verdict is to "[r]eview the tendencies of the evidence most favorable to the [party moved against], regardless of any view we may have as to the weight of the evidence and we must allow such reasonable inferences as the jury were free to draw, not *995 inferences which we may think the more probable." Alabama Power Company v. Irwin, 260 Ala. 673, 72 So.2d 300 (1954); Briggs v. Birmingham Railway Light & Power Company, 188 Ala. 262, 66 So. 95 (1914).
As more recently stated in Ford Motor Company v. Rodgers, Ala., 337 So.2d 736 [1976]:
"In determining the propriety of granting a motion for a directed verdict the court must indulge every inference in favor of the non-moving parties. ARCP, Rule 50; Alabama Power Company v. Taylor, 293 Ala. 484, 306 So.2d 236 (1975)."
A. Intervening Cause Defense.
We have reviewed the trial Court's entire instruction to the jury, placing particular emphasis on that portion of the charge dealing with proximate cause and intervening cause. We find that under this instruction, including five charges requested in writing by Beloit concerning proximate cause, this question was properly submitted to the jury; and we further find that there is sufficient evidence to support its finding that Beloit's negligent design was the proximate cause, or the proximate contributing cause, of the injury.
A basic principle of tort law, so fundamental as to require no citation, is that a tort-feasor whose act or acts contributes in causing an injury may be held liable for the entire resulting loss. Butler v. Olsham, 280 Ala. 181, 191 So.2d 7 (1966); see also Prosser, Law of Torts, 4th Ed., pp. 291-323 (1971).
Indeed, the following two charges given at Beloit's request recognize this basic tort principle:
"14. The Court charges the jury that the seller of a product such as Beloit Corporation in this matter, is not an insurer against all harm which might be caused by a user of his product. A seller is also not liable in damages where the product sold by it is made unsafe by another person after it leaves the seller's control. Therefore, if you are reasonably satisfied from the evidence in this case that at the time physical control of the papermaking machine referred to in the Plaintiff's Complaint was relinquished to Southern Marathon Corporation it was in a reasonably safe condition, and if you are further reasonably satisfied from the evidence in this cause that modifications were made to the machine by persons other than the Defendant, Beloit Corporation, after the machine was turned over to Southern Marathon Corporation or the Plaintiff's employer, and if you are further reasonably satisfied from the evidence in this cause that the modifications made by persons other than the Defendant, Beloit Corporation, was the sole proximate cause of the Plaintiff's injuries and damages and that the Defendant, Beloit Corporation, was not guilty of any other negligence, then the Court charges the jury that you cannot return a verdict in favor of the Plaintiff and against the Defendant, Beloit Corporation.
"14a. The Court charges the jury that the seller of a product such as Beloit Corporation in this matter, is not an insurer against all harm which might be caused by a user of his product. A seller is also not liable in damages where the product sold by it is made unsafe by another person after it leaves the seller's control." [2]
There is ample evidence that Beloit was aware that the air chute did not work from the outset when the machine was installed and thus Beloit could foresee the probability that this chute would be removed. Beloit's expert, Mr. Cleiler, testified that the chute as installed would probably not function as an automatic feeder on heavy grades of paper. Secondly, there seems little dispute that these doctor blades were not guards. Mr. Cleiler stated, "I do not consider these doctor blades guards."
*996 This testimony, together with the exhibits admitted into evidence, constitutes sufficient evidence from which the jury could properly infer that the presence of the blades would not have prevented the accident.
Furthermore, Harrell's expert witness, Professor Landry (a design engineer who was currently serving as the National President of the American Society of Safety Engineering), testified:
"My opinion is that that calendar stack as it was designed and manufactured by Beloit and subsequently shipped to and assembled at the Marathon Paper which was subsequently changed to American Can, does or did, in my opinion, within the known state of the art at that particular time, present a hazardous situation from the viewpoint that the most hazardous part of that machine, the nip point between the in-running rolls, was not protected or guarded in any way to prevent the entry of a man's hand in between the pinch point or in between any of the sets of in-running rolls. The machine also lacked some other considerations from the point of view of safety but that was the principle one.
". . . There are instances where automatic feeds break down. They are not always functional. They get out of adjustment. It then becomes necessary to supplement on occasions automatic feed with manual feeding. Sometimes adjustments have to be made on the machine while it is running. Under those circumstances, then you would have the same kind of exposure to the man as if there was no automatic aspect to the machine. So, when that situation prevails, then the prudent and desirable thing and necessary thing from a safety engineering viewpoint is to anticipate those situations and provide the physical barrier guard at, in this instance, the in-running nip point of the rolls. Realizing that the automatic devices may at some time fail or require technical adjustment.
". . . then again the proper approach is, considering the safety of the man, to provide for the supplemental protection at the nip point by use of fixed barrier guards. . . .
"I think the most explosive one is this excerpt from the Accident Prevention Manual published by the National Safety Council in 1955 which shows different types of barrier guards from an angle bar to three bars with spacing in between, in a sense, a round pipe guard that would fit up close to the nip point or to a straight barrier guard, all of which, of course, allow room for the stock to come in here, straight across or from the top roller or the under roller. These are basically principles of the types of barrier guards that are employed in a variety of operational circumstances to prevent a man's hand from getting in the nip point."
We hold, therefore, that the intervening cause issue was properly submitted to the jury.
B. Open and Obvious Defense.
Beloit argues that there is no duty owed by a remote manufacturer to a workman to guard against known, open and obvious dangers to the workmen. Translated literally, this seems to say that Beloit did not owe Harrell a duty to protect him from known, open and obvious dangers.
The open and obvious doctrine appears to have its genesis in the case of Campo v. Schofield, 301 N.Y. 468, 95 N.E.2d 802 (1950). Stated succinctly, the doctrine is that there is no liability on the part of a manufacturer for injuries resulting from dangers which are patent and obvious. New York, which begat this doctrine in Campo, has since destroyed it in the recent case of Micallef v. Miehle Co., 39 N.Y.2d 376, 384 N.Y.S.2d 115, 348 N.E.2d 571 (1976). The New York Court of Appeals, in overruling Campo, stated, "Campo suffers from its rigidity in precluding recovery whenever it is demonstrated that the defect was patent. Its unwavering view produces harsh results in view of the difficulties in our mechanized way of life to fully perceive the scope of danger which may ultimately be found by a court to be apparent in *997 manufactured goods as a matter of law." 384 N.Y.S.2d at 120, 348 N.E.2d at 577.
Taken to its logical conclusion, the application of the open and obvious doctrine amounts to an assumption of risk as a matter of law. Additionally, its application would relieve the defendant of the burden of proving that the plaintiff subjectively appreciated a known risk. In view of our highly technological environment, an adoption of such a doctrine would be a step backwards in an increasingly mechanized society. In essence, the doctrine permits the manufacturer to ignore a known hazard and escape liability because the workman also recognized the danger.
Ordinarily, the conduct of the plaintiff, in his use of an alleged defective product, is a factual issue for the jury. See the "Allowable Defenses" section of Atkins v. American Motors Corporation, Ala., 335 So.2d 134 (1976).[3] In the context here applicable, we decline to apply the open and obvious defense as a matter of law. Under the evidence in the instant case, we hold that the jury was free to find that Beloit had the means and technology to make the product safe, while Harrell had but one choiceto work or not. Consequently, we hold that the open and obvious issue was likewise a question of fact for the jury.
II. The Failure to Allow Objections to Court's Charge Issue.
Beloit argues that the trial Judge committed reversible error in denying counsel the right to make specific objections to the Court's charges before the jury retired. The trial Judge did, however, allow each attorney "an exception to everything the Court had said or done in the charges." The Judge elaborated by stating that his purpose was to preserve for all the attorneys any error committed.
Although we do not approve of the Court's refusal to allow counsel to state their objections before the jury retired for deliberation, we believe no prejudicial error was committed unless the given instructions were themselves erroneous; and our careful review of all challenged portions of the charge discloses no erroneous jury instruction.
The purpose of allowing counsel the opportunity to state their objections is twofold. First, it preserves, for appellate review, any error committed in the giving of a defective instruction. Secondly, it offers the trial judge an opportunity to correct any error he may have committed. See ARCP, Rule 51, and Comments. Here, there is no question that the trial Judge, by refusing to allow the parties to state specific objections to his charge, denied himself the opportunity to correct any error he might have made; but the crucial question is whether, absent an erroneous charge, this was prejudicial to Beloit. We hold it was not.
III. The Excessive Verdict Issue.
Beloit contends that the jury verdict was so excessive that it showed bias, prejudice and partiality on the part of the jury. It has long been established that compensatory damages for pain and suffering must be left to the sound discretion of the jury subject only to correction for clear abuse or passionate exercise. Birmingham Electric Co. v. Howard, 250 Ala. 421, 34 So.2d 830 (1948).
Beloit's chief contention is founded on the evidence that Harrell returned to work at American Can prior to the trial. This is merely one factor to be considered by the jury in determining if there has been a loss of earning capacity. As stated in Louisville & N. R. Co. v. Steel, 257 Ala. 474, 59 So.2d 664 (1952):
"Furthermore the plaintiff is not precluded from recovery for impairment of his earning power by reason of injuries sustained by him because he returned to work in October 1949 and worked up until *998 the time of the trial in December 1950. It is held that wages actually earned by a person and his earning power are not identical. The fact that the plaintiff worked for appellant for several months prior to the trial of the case was merely evidence to be considered by the jury in determining whether or not his earning power had been impaired by the accident."
The distinction between loss of actual earnings and loss of earning capacity is well stated in Lawrence v. Norfolk Dredging Company, 319 F.2d 805 (4th Cir. 1963):
"[A] comparison of earnings before and after the injury is not a particularly significant or controlling consideration where there was evidence before the jury to support the conclusion that, under circumstances such as these, the injuries will affect plaintiff's future employment possibilities."
Mr. Bennett, an employment specialist, gave his expert opinion that Mr. Harrell's age, educational background, training, work history, coupled with the damage to his hands, and the fact that the plaintiff was "over-employed" in his present job rendered him virtually unemployable for other work. (On the efficacy of non-medical expert testimony on the issue of employability and occupational disability, see Hagler v. Gilliland, 292 Ala. 262, 292 So.2d 647 (1974)).
Dr. Rutledge, the orthopedist who performed three separate surgical procedures on Mr. Harrell, stated:
"Mr. Harrell is obviously very limited in what he can do with his hands. He can pick up things. He cannot decipher what he is holding [no sense of feel] but he can pick up things and that's about all. His occupation has to be very sedentary. . .and cannot involve . . . any type of job that involves any manual dexterity at all."
Unquestionably, if loss of earning capacity, coupled with the other special damages, were the only elements of damages presented for the jury's consideration, we could not justify an affirmance of the $800,000 verdict. But our cases have consistently held that all injurious residuals proximately resulting from permanent injury negligently inflicted by one party upon another, properly plead and proved, are due to be considered by the jury in arriving at its verdict. Some of these factors were enumerated in Alabama Great Southern R. Co. v. Flinn, 199 Ala. 177, 74 So. 246 (1917):
"Pain and suffering, past and future, impaired health, diminished earning or working capacity, mutilation or disfigurement, and expenses of nursing and care; and there may be incurred many other detrimental effects, and expenses, as the natural and proximate result of the injury. . .
"`It is to be assumed that every physical endowment, function, and capacity is of importance in the life of every man and woman, and that occasion will arise for the exercise of each and all of them. And to the extent to which any function is destroyed, or its discharge rendered painful or perilous by the wrongful infliction of personal injury, is the party complaining entitled to damages. We can, in other words, conceive of no physical injury, wrongfully inflicted, whether entailing pain only, or disfigurement, or incapacity, relative or absolute, to perform any of the functions of life, which may not be made the predicate for compensation in damages.'"
This eloquent expression, originally stated in Hill's Case, 93 Ala. 514, 9 So. 722 (1890), is founded on the premise that man does not live by bread alone. Approximately one-third of man's waking hours consist of life that is consumed neither by sleep nor work. The very presence of Harrell for the jury's observation during trial was evidence from which the jury could measure the worth of the pain and suffering and the diminution of those functions so essential to the fullness of life; for all man does is live. Lawrence v. Norfolk Dredging Company, supra.
Our detailed review of the evidence does not convince us that the jury abused its discretion in its award of damages. Both hands were virtually traumatically *999 amputated, leaving only a 5% function of each hand. That a jury would render so large a verdict for such an injury does not of itself indicate bias, prejudice or other improper motive.
Moreover, the denial by the trial Court of this ground for a new trial serves to strengthen the validity of the jury verdict. A good statement of the rule is found in Carlisle v. Miller, 275 Ala. 440, 155 So.2d 689 (1963):
"It is almost platitudinous to restate the guiding rules, but here they are: The verdict of a jury should not be interfered with merely because in the opinion of the court the jury gave too little or too much . . . and the authority vested in the courts to disturb a verdict of the jury on the ground of excessiveness is one which should be exercised with great caution. . .
Where, as here, there is no set standard for the admeasurement of damages but the damages to be awarded are left to the sound discretion of the jury, a remittitur or a new trial should not be ordered on the ground of excessiveness of the jury's verdict except in those cases where the court can clearly see that the verdict has been reached on account of bias, passion, prejudice, corruption, or other improper motive or cause . . . And only where the damages allowed are so excessive as to warrant the belief that the jury must have been misled by some mistaken view of the merits of the case should the court interfere and set the verdict aside . . . also, where the trial court refuses to grant a new trial because he does not believe the verdict is excessive, the favorable presumption attending the jury's verdict is thereby strengthened."
We therefore affirm.
AFFIRMED.
FAULKNER, SHORES and EMBRY, JJ., concur.
HEFLIN, C.J., and BLOODWORTH, ALMON and BEATTY, JJ., concur specially.
MADDOX, J., dissents.
BLOODWORTH, Justice (concurring specially).
I concur. Although I think that the verdict is "too much," I am not convinced that the verdict is "excessive" under our case law, so that we would be justified in ordering a remittitur.
". . . The verdict of a jury should not be interfered with merely because in the opinion of the court the jury gave too little or too much. . . .[A] remittitur or a new trial should not be ordered on the ground of excessiveness of the jury's verdict except in those cases where the court can clearly see that the verdict has been reached on account of bias, passion, prejudice, corruption, or other improper motive or cause. . . "
Carlisle v. Miller, 275 Ala. 440, 155 So.2d 689 (1963). See also Vest v. Gay, 275 Ala. 286, 154 So.2d 297 (1963).
HEFLIN, C. J., and ALMON and BEATTY, JJ., concur.
MADDOX, Justice (dissenting).
Liability for product-caused harm may not be imposed on a manufacturer in the absence of proof that the product was defective or dangerous at a time when the manufacturer had possession of it or was otherwise responsible for its condition with respect to danger or defect. A manufacturer is not liable for injuries caused by a defective product if the defect was caused by an alteration which amounts to an intervening or superseding cause of the injury.
Here, the evidence is uncontradicted that after the machine left the control of the manufacturer, it was altered by removal of the automatic paper threading device, the removal of the doctor blades and the alteration of the catwalk. If the machine had not been altered, I do not believe, as a matter of law, that the accident could have occurred as it did.
While I recognize that not every modification of a product after it has left the hands of the manufacturer will defeat recovery, but only such modification as might *1000 significantly contribute to the accident, I believe that the modification here not only significantly contributed to the accident, but, in fact, caused it.
The plaintiff's theory, adopted by eight members of this Court, is that Beloit should have foreseen that American Can would modify the machine and make it dangerous, While I recognize that foreseeability is normally a jury issue, I believe that justice requires that, under the facts of this case, this Court should find that Beloit was not under any duty to foresee that these major modifications of its product would be made. In fact, I believe that Beloit has been deprived of due process of law under both State and Federal Constitutions. Consequently, I respectfully dissent.
NOTES
[1] Tit. 26, § 312, Code, provides: "Where the injury . . . for which compensation is payable . . . was caused under circumstances also creating a legal liability for damages on the part of any party other than the employer the employee . . . may bring an action against such other party to recover damages for such injury . . ."
[2] Our setting out of these charges is not to be construed as approving these charges as correct statements of the law; rather, we are pointing out that the trial Judge in his instruction to the jury covered this area of applicable law in the language requested by Beloit.
[3] On the "open and obvious" issue in a nonproducts liability case, see Kingsberry Homes Corp. v. Ralston, 285 Ala. 600, 235 So.2d 371 (1970). On the "open and obvious" issue in a products liability case, but arising in a different factual context from the instant case, see Ford Motor Company v. Rodgers, Ala., 337 So.2d 736 [1976].