695 So.2d 607 (1997)
Antoinette V. HALSEY, etc.
v.
A.B. CHANCE COMPANY.
1950235.
Supreme Court of Alabama.
March 14, 1997.
Rehearing Denied May 16, 1997.
Tom Dutton and Chris T. Hellums of Pittman, Hooks, Marsh, Dutton & Hollis, P.C., Birmingham, for appellant.
Samuel H. Franklin, Lee M. Hollis, and Madeline H. Haikala of Lightfoot, Franklin & White, L.L.C., Birmingham, for appellee.
COOK, Justice.
Antoinette V. Halsey, as administratrix of the estate of her husband, Roderick M. Halsey, appeals from a summary judgment for the defendant A.B. Chance Company in this wrongful death action. Mrs. Halsey claims that Chance negligently or wantonly designed, manufactured, and sold the epoxiglas platform from which her husband, an Alabama Power Company lineman, fell. He died from injuries received in the fall. Mrs. Halsey also alleges in her complaint that Chance negligently or wantonly failed to warn her husband regarding the potential dangers of using a "keeper pin" to splice a chain. Mrs. Halsey seeks to impose on Chance liability under the Alabama Extended Manufacturer's Liability Doctrine (AEMLD). The trial court entered a summary judgment for Chance on all counts. We affirm the summary judgment as to the wantonness claims, but as to all other claims we reverse the summary judgment and remand.
*608 The evidence before the trial court when it entered the summary judgment, considered in the light most favorable to the plaintiff, the nonmoving party, indicates that the platform upon which Mr. Halsey was working gave way after Mr. Halsey, attempting to follow the instructions of his foreman, spliced the chain on the platform in order to extend the chain around a utility pole. The chain was used to secure the platform to the pole at a point over 50 feet above the ground. Mr. Halsey spliced the chain by inserting a padlock through the keeper pin, which was located at the end of the chain. The keeper pin later gave way or opened up while Mr. Halsey was working on the outer end of the platform, causing the platform and Mr. Halsey to fall.[1]
First, Mrs. Halsey claims that Chance is liable to her under the AEMLD. We have said:
"This Court has recently restated the elements of a claim under the [AEMLD]:
"`"To establish liability, a plaintiff must show:
"`"(1) he suffered injury or damages to himself or his property by one who sells a product in a defective condition unreasonably dangerous to the plaintiff as the ultimate user or consumer, if
"`"(a) the seller is engaged in the business of selling such a product, and
"`"(b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold."'

Yamaha Motor Co. v. Thornton, 579 So.2d 619, 621 (Ala.1991) (quoting Casrell v. Altec Indus., Inc., 335 So.2d 128, 132-33 (Ala.1976))....
"We note that `the mere fact that a product has been modified by the buyer subsequent to the sale does not always relieve a manufacturer of liability.' Johnson v. Niagara Machine & Tool Works, 555 So.2d 88, 91 (Ala.1989)."
Williamson v. Tyson Foods, Inc., 626 So.2d 1261, 1263-64 (Ala.1993) (emphasis omitted). We have also said:
"An essential element of an AEMLD claim is proof that the product reached the consumer without substantial change in the condition in which it was sold. Clarke Indus., Inc. v. Home Indemn. Co., 591 So.2d 458, 462 (Ala.1991); see also Caterpillar Tractor Co. v. Ford, 406 So.2d 854 (Ala.1981). However, the mere fact that a product has been altered or modified does not necessarily relieve the manufacturer or seller of liability. Johnson v. Niagara Machine & Tool Works, 555 So.2d 88, 91 (Ala.1989). A manufacturer or seller remains liable if the alteration or modification did not in fact cause the injury, Johnson, 555 So.2d at 91 (quoting Industrial Chem. & Fiberglass Corp. v. Hartford Acc. & Indemn. Co., 475 So.2d 472, 476 (Ala. 1985)); Bullen v. Roto Finishing Systems, 435 So.2d 1256 (Ala.1983); Brown v. Terry, 375 So.2d 457 (Ala.1979), or if the alteration or modification was reasonably foreseeable to the manufacturer or seller. Clarke Indus., 591 So.2d at 462; Beloit Corp. v. Harrell, 339 So.2d 992 (Ala.1976)."
Sears, Roebuck and Co. v. Harris, 630 So.2d 1018, 1027 (Ala.1993), cert. denied,511 U.S. 1128, 114 S.Ct. 2135, 128 L.Ed.2d 865 (1994) (emphasis added). The question for the trial court, therefore, was whether a jury could find it foreseeable to Chance that someone would utilize the keeper pin as a load-bearing link when attempting to extend a chain. In entering the summary judgment, the trial court implicitly held that, as a matter of law, it was not foreseeable that someone would use the keeper pin as Mr. Halsey apparently did. We disagree.
Chance contended that Mr. Halsey misused the keeper pin and that it was not foreseeable to Chance that the keeper pin would be used in such a fashion. In opposition to the motion for summary judgment, however, the plaintiff offered the deposition testimony of an expert witness, Dr. Edward Karnes:

*609 "Q. And what about you as a layperson just looking at this device and that keeper pin, if you were going to get up on a pole and hook that thing up, would you put a padlock through that?
"A. I think I would. If I couldn't get the padlock and I was going to do the splicing and I couldn't get it through the chain link, I think I probably would.
"I think I would reasonably assume, again, based on the kind of expertise that I have, that the pin would have the same strength characteristics as the chain, because it's attached to the chain. And I think I especially would, if I had read any of the materials in which that pin is referred to as a safety pin. And that's not on the pin itself, but if I had knowledge that it little device there [sic], a couple of holes, an attachment, but it looks like it's the end of the chain and it's just, you stick the chain in to kind of keep it out of the work area or just dangling loose."
C.R. at 235-36. Dr. Karnes further testified:
"Q. Right. Now to your fourth and final opinion, I believe you said that the foreseeability of a user splicing a chain is a given; is that right?
"A. It's a given.
"Q. And what do you base that upon?
"A. The very fact that the company, A.B. Chance, makes various lengths of extension chains, and the fact that power poles come with different diameters. And more important than that, the concrete poles have variable diameters according to the length of the pole.
"Q. All right. So in this opinion you're saying the foreseeability of a user splicing the chain is a given from A.B. Chance's perspective?
"A. Certainly.
"Q. And that applies to any given customer of A.B. Chance's, as well?
"A. Certainly."
"....
"Q. What about the likelihood of someone putting the padlock, a padlock through a keeper pin on a device such as this? What probability do you assign to that?
"A. I would place a fairly high probability on it, since the keeper pin, or the safety pin as it's called, is attached to the chain, looks like part of the chain.
"Q. Have you done any study or anything else other than just what you just explained to form that opinion?
"A. No. And the fact that it was done in this case."
C.R. 245-47. The plaintiff claims that this testimony constitutes substantial evidence requiring the trial court to submit to the jury her claim that Chance was liable under the AEMLD. We agree. In Sears, Roebuck, supra, we stated:
"`"When asserting misuse as a defense under [the] AEMLD, the defendant must establish that the plaintiff used the product in some manner different from that intended by the manufacturer. Stated differently, the plaintiff's misuse of the product must not have been `reasonably foreseeable by the seller or manufacturer.'"' [Kelly v. M. Trigg Enterprises, Inc., 605 So.2d 1185 at 1192 (Ala.1992),] (quoting Edward C. Martin, Alabama's Extended Manufacturer's Liability Doctrine (AEMLD), 13 Am. J. Trial Advoc. 983, 1040 (1990)). Ordinarily, the plaintiff's misuse of an allegedly defective product is a factual issue for the jury. Kelly, 605 So.2d at 1192; Banner Welders, Inc. [v. Knighton], 425 So.2d [441] at 448 [(Ala. 1982)]; Beloit Corp. v. Harrell, 339 So.2d 992, 997 (Ala.1976).... The question is whether this misuse of the product was reasonably foreseeable by [the defendants]."
630 So.2d 1018, 1028 (Ala.1993) (emphasis added). The expert testimony offered in opposition to the summary judgment motion constitutes substantial evidence that the misuse of the keeper pin, in this case, was foreseeable. Therefore, the plaintiff's AEMLD claim should have been submitted to the jury.
Mrs. Halsey also claims that Chance negligently or wantonly failed to warn Mr. Halsey of the dangers of using the keeper pin as a load-bearing device. Chance, in support of its motion for summary judgment, claimed that it manufactured extension *610 chains for use under the very circumstances of this case and that Mr. Halsey should have used one of those chains when he discovered that the platform chain was too short. Instead of using such a chain, however, Mr. Halsey used a padlock to extend the platform chain and hooked that padlock through the keeper pin instead of the last link of the chain. Chance contends that the deposition testimony of several Alabama Power Company linemen offered in support of the motion for summary judgment indicated that the use of a padlock was not accepted practice.
In opposition thereto, Mrs. Halsey points to the report based on Alabama Power Company's investigation of Mr. Halsey's accident, which contains the following statements:
"The use of an APCo `X' lock had been used by other Power Delivery-Line Construction employees, and those interviewed stated they assumed this was an acceptable method to splice chain.
"Prior to installing the work platform at the middle conductor location, this method of splicing the chains was discussed with Halsey by some crew members. Not all crew members on this job were familiar with this method of splicing chain."
C.R. at 262. This portion of the report seems to indicate that at least some linemen had used padlocks to splice chains. Chance claims that even if linemen were using padlocks, hooking one through the keeper pin created an open and obvious danger because, it says, anyone could see from observing the keeper pin that it was not a link in the chain and that it did not have the same strength as a link in the chain.
Dr. Karnes's deposition testimony indicates that because of the location of the keeper pin and the fact that it was of a color similar to that of the chain it was foreseeable that someone would mistake the pin for a load-bearing link. This testimony created a jury question as to whether the danger was open and obvious. Dr. Karnes testified as follows in his deposition:
"Q. Could you list for me all of the opinions you have formed in this case?
"A. Sure. My first opinion is that the company, A.B. Chance, failed to exercise reasonable and appropriate care from a human-factors standpoint by failing to provide written instructions with the work platform. And included in such instructions should have been warnings and safety information in addition to strictly instructional information.
"My second opinion is that A.B. Chance again did not exercise reasonable, appropriate care by failing to provide an on-product warning on the platform that would be available to persons who would be specifically at risk in using the platform.
"A third opinion is that the company failed to exercise reasonable care, again from the human-factors standpoint, by not providing some type of mechanical accommodation that would have prevented, or at least minimized, the possibility of the safety pin being used in a chain splice, as part of the splice.
"And there are various alternatives that I've identified from my review of materials, such as perhaps painting it red, the safety pin, or not making it an integral part of the chain, attaching it by a wire or something like that.
"And the last opinion I have is that the foreseeability of a user splicing the chain is a given....
"If you do not provide instructions for a piece of equipment or a product, you are leaving the issue of proper use to chance, essentially. Not A.B. Chance, but to chance.
"If you provide written instructions you have a reliable format that can be used to educate users about proper use of the product and what specifically to do and what not to do when using the product."
C.R. at 306-08. He further testified:
"Q. So I assume it's your opinion, even if Mr. Halsey knew of this danger, there should have been a warning on there to remind him?
"A. I think it would have been important to remind him of that, even if he knew thatwell, if he knew that putting the lock through the safety pin could fail, I don't think he would have done that. It's that simple.

*611 "If he knew that he shouldn't be splicing because of possible failures, I think that having that on-product warning would have been quite beneficial for him, not only as a reminder, but as a basis for doing something that would deviate from good worker practices.
"The problem we have with workers in industry, is that workers try to do the best job available, contrary to what a lot of people think. They're motivated to do good work. And they're motivated to do good work so that they can be promoted and they get approbation from, not only supervisors, but other employees."
C.R. at 249.
By presenting this testimony from her expert witness, Mrs. Halsey presented substantial evidence supporting her negligent-failure-to-warn claim and her negligent-design/manufacture claim; thus, those claims should have been submitted to the jury. We agree with Chance, however, that the record contains no substantial evidence of wantonness.
The summary judgment is affirmed as to the claims alleging wantonness; it is otherwise reversed and the cause is remanded.
AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.
ALMON, KENNEDY, and BUTTS, JJ., concur.
HOUSTON, J., concurs specially.
HOOPER, C.J., concurs in part and dissents in part.
MADDOX and SEE, JJ., dissent.
HOUSTON, Justice (concurring specially).
As the author of Purvis v. PPG Industries, Inc., 502 So.2d 714 (Ala.1987); Entrekin v. Atlantic Richfield Co., 519 So.2d 447 (Ala.1987); and Yarbrough v. Sears, Roebuck & Co., 628 So.2d 478 (Ala.1993), which the defendant A.B. Chance Company relies on heavily in arguing that we should affirm the summary judgment, I conclude that those cases are distinguishable from the present case.
HOOPER, Chief Justice (concurring in part and dissenting in part).
I concur with that portion of the majority opinion that affirms as to the wantonness claims. As to the holdings on the other claims, I dissent. Mrs. Halsey did not present substantial evidence to support her claims alleging negligent design/manufacture and failure to warn.

Facts and Testimony
The defendant A.B. Chance Company presented the testimony of several Alabama Power Company employees who were familiar with the proper use of this platform. David Dahlke, who was responsible for training linemen such as Mr. Halsey, stated that the proper method for extending the chain on a "hot line tool" would be to use the extension chain supplied by Chance. He stated that he deals with OSHA requirements and that a designed system such as the Chance platform must be used with the manufacturer's recommended devices. When asked if the padlock/keeper pin method Mr. Halsey used to extend the chain was a proper way to extend it, Dahlke responded: "Not only no, but hell no." (C.R.126-30.)
Chance sold extension chains for the very purpose for which Mr. Halsey used the keeper pin. Alabama Power had on hand between 50 and 100 extension chains made by various manufacturers; sixteen of them had been purchased from Chance. It was undisputed that these chains would have safely extended the chain of the platform from which Mr. Halsey fell. The keeper pin is clearly not a link in the chain. The keeper pin is not welded closed but has an open-ended eye connecting it to the chain. A chain link has no open end that a heavy weight, like the platform in this case, could pull open. On the day of Mr. Halsey's fall, Mickey Flowers, the crew leader, had offered to demonstrate for Mr. Halsey the proper use of the platform. Mr. Halsey refused, saying he had previously hung such platforms. When the chain Mr. Halsey was using could not reach around the pole, Flowers sent two lengths of chain and two Alabama *612 Power "X" padlocks up to Halsey.[2] Flowers did not give Mr. Halsey the authorized extension chains provided by Chance to Alabama Power. Chance also did not design, manufacture, or sell the padlocks given to Halsey. Instead of placing the padlocks into two links in the chains on the platform, Halsey placed the padlocks through the eyes of the keeper pins. Doyle Darby, a supervisor who was involved with Alabama Power's post-accident investigation, said that Mr. Halsey could have attached the padlocks to the last link of each chain where the keeper pins were attached, instead of to the keeper pins themselves. (C.R.278-79.)
According to one of Mrs. Halsey's experts, Dr. Paul Packman, the platform and pivot attachment fell from the pole because the padlocks pulled through the keeper pins, disconnecting the chains from the pole and allowing the platform and Mr. Halsey to fall. Dr. Packman said that the "accident probably would not have taken place if [Mr. Halsey] had not used the keeper pin as part of the connector." (C.R.181.)
Mr. Halsey's coworkers also testified. J.R. Walton testified that, based on the knowledge he had before the accident, he would not put a padlock into the keeper pin to extend a chain while on one of these platforms. He stated: "First thing, it's not a proper way to put a board up. That keeper pin, in looking at it, from my mind, would not hold the kind of weight you are looking at there.... It's not a solid link." (C.R.194.) He said a person could know that from simply looking at it.
Mickey Flowers, the crew leader, testified similarly about not putting a padlock through a keeper pin: "It's open on one end.... It could come out." (C.R.108-09) He said he knew that not because he had to be warned but because of "common sense." Hubert McBrayer stated that there was "no way" he would place a padlock in the eye of a keeper pin to extend a platform chain because he could tell from looking at the pin that it was too weak to hold. Five other coworkers agreed that it was obvious that a keeper pin could not hold the weight if it was being used to extend a platform chain, as Mr. Halsey was using the keeper pin in this case. A supervisor, Doyle Darby, testified that he could tell the keeper pin was insecure as a load-bearing device. Mr. Robert Homan, the general foreman at the project Mr. Halsey was working on, testified as to why the keeper pin was not adequate: "It had a point of separation.... [I]t had a gap in it." (C.R. 165.)
Dr. Packman explained that the only purpose of the keeper pin was its use as a safety device. Its purpose is to secure the chain in a slot on the pole; it keeps the chain from disengaging completely if the chain comes loose from the slot holding it on the pole. He also stated that Halsey misused the keeper pin.
The only evidence the majority relies upon to reverse the judgment of the trial court is the testimony of Mrs. Halsey's expert Dr. Edward Karnes. He gave his opinion of how he thought a layperson would have acted in the situation in which Mr. Halsey found himself. He stated:
"Q. And what about you as a layperson just looking at this device and that keeper pin, if you were going to get on a pole and hook that thing up, would you put a padlock through that?
"A. I think I would....
"I think I would reasonably assume, again, based on the kind of expertise that I have, that the pin would have the same strength characteristics as the chain, because it's attached to the chain."
(C.R.236.) He stated that "the foreseeability of a user splicing the chain is a given from A.B. Chance's perspective." The defendant presented the deposition testimony of several laypersons.
Karnes went on to address the issue of warning:
"My second opinion is that A.B. Chance again did not exercise reasonable, appropriate care by failing to provide an on-product warning on the platform that *613 would be available to persons who would be specifically at risk in using the platform.
"....
"And there are various alternatives that I've identified from my review of materials, such as perhaps painting it red, the safety pin, or not making it an integral part of the chain, attaching it by a wire or something like that."
(C.R.306-08.)

Analysis
The testimony of those who used these platforms and chains on a regular basis was uniform, and they were adamant in saying that the danger of using the keeper pin in the way Mr. Halsey used it was open and obvious. The trial judge was able to examine the physical evidence. Chance's appellate brief included a color photograph of the keeper pin. Mrs. Halsey's expert even admitted that Mr. Halsey misused the keeper pin. The "layperson" testimony of Mrs. Halsey's expert, Dr. Karnes, is not substantial evidence that should overcome Chance's properly supported summary judgment motion. There is no issue for the jury, because the testimony was undisputed that Mr. Halsey misused the product. The only question was whether it was reasonably foreseeable that a user would misuse the product in this way. The platform that fell was 18 years old. In all the time Chance had manufactured these platforms, there had never before been an accident in which someone had used the keeper pin as a load-bearing device. When I compare it to the evidence presented by Chance, I do not consider substantial the "layperson" testimony of a plaintiff's expert as to the similarity between the color of the keeper pin and the color of the chain.
Some might argue that the opinion of an "expert" should outweigh the opinions of several users of a product. Not necessarily so. Trial courts must carefully scrutinize the opinions of so-called experts to ensure that a jury does not hear what has in recent years come to be known as "junk science." It is that very presumptionthat "experts" know better than the average personthat makes "junk science" so dangerous. Peter W. Huber's book Galileo's Revenge: Junk Science in the Courtroom (1991), at pp. 2-3, gives an apt description of the junk science phenomenon:
"Junk science cuts across chemistry and pharmacology, medicine and engineering. It is a hodgepodge of biased data, spurious inference, and logical legerdemain, patched together by researchers whose enthusiasm for discovery and diagnosis far outstrips their skill. It is a catalog of every conceivable kind of error: data dredging, wishful thinking, truculent dogmatism, and, now and again, outright fraud."
The majority has based its reversal of this trial judge's summary judgment decision solely on one "expert" opinion. That opinion was applied to a question of common sense and experience as to the proper use of the platform involved in this case. It was an opinion that should hold no more weight than the testimony of the men who used that platform. The trial judge, who examined the keeper pin, apparently thought it was worthy of less weight. This Court should not substitute its judgment of the value of that opinion for that of the trial judge.
The plaintiff's expert says that Chance not only should have foreseen this obviously dangerous use, but also should have provided an on-product warning of some kind to prevent the kind of misuse Mr. Halsey made of the keeper pin. The number of misuses of any one product is perhaps infinite. A product that can perhaps be misused in the greatest variety of ways is the match. It can light a fire for grilling steaks, or it can light a bomb for demolishing a building and destroying hundreds of lives. Yet, so far as I know, no court ever has requiredand I hope never will requirea match manufacturer to place an on-product warning as to all the foreseeable misuses of a match. There is a limit as to what a manufacturer should be expected to warn users of, particularly when the warning applies to an obvious misuse of the product. In this case, the evidence is clear that using the keeper pin as a weight-bearing device was openly and obviously dangerous. The following questions come to mind: How could painting the keeper pin red have kept Mr. Halsey from misusing it? The platform was 18 years old. I do not know the age of *614 the extension chains. Would the red paint on a chain and keeper pin not wear off with several years of use? Would attaching the keeper pin by a wire not create another dangerthat of losing the keeper pin if the wire broke over time? Would on-product writing not wear out over time? Must a manufacturer warn an intended user of every conceivable dangerous misuse one might make of that manufacturer's product, no matter how obvious the danger is? I do not think so.
For these reasons, I must respectfully dissent from that portion of the opinion that reverses the summary judgment in favor of the defendant as to the claims alleging negligent design/manufacture and failure to warn.
MADDOX, Justice (dissenting).
I must respectfully dissent. I believe the summary judgment was proper because the evidence shows, as a matter of law, that Roderick Halsey's death was caused by his own negligence and that the defendants had no duty to warn or otherwise protect Mr. Halsey.
Contributory negligence as a defense to an AEMLD action may be found as a matter of law:
"`In order to sustain a finding of contributory negligence as a matter of law, there must be a finding that the plaintiff put himself in danger's way, Mackintosh Co. v. Wells, 218 Ala. 260, 118 So. 276 (1928), and a finding that the plaintiff appreciated the danger confronted, Wilson v. Alabama Power Co., 495 So.2d 48 (Ala.1986); Marquis v. Marquis, 480 So.2d 1213 (Ala.1985); Baptist Medical Center v. Byars, 289 Ala. 713, 271 So.2d 847 (1972); Mackintosh Co. v. Wells, supra. Moreover, it must be demonstrated that the plaintiff's appreciation of the danger was a conscious appreciation at the moment the incident occurred. Marquis v. Marquis, supra; Elba Wood Products, Inc. v. Brackin [356 So.2d 119 (Ala.1978)]. Mere "heedlessness" is insufficient to warrant a finding of contributory negligence as a matter of law. Decatur Light, Power & Fuel Co. v. Newsom, 179 Ala. 127, 59 So. 615 (1912).'"

"Central Alabama Electric Co-op. v. Tapley, 546 So.2d 371, 381 (Ala.1989), quoted in Smith v. U.S. Construction Co., 602 So.2d 349, 350-51 (Ala.1992); Empiregas, Inc. of Belle Mina v. Suggs, 567 So.2d 271, 273 (Ala.1990)."
Hicks v. Commercial Union Ins. Co., 652 So.2d 211, 219 (Ala.1994); see also, Uniroyal Goodrich Tire Co. v. Hall, 681 So.2d 126 (Ala.1996); General Motors Corp. v. Saint, 646 So.2d 564 (Ala.1994); Campbell v. Cutler Hammer, Inc., 646 So.2d 573 (Ala.1994); and Gulledge v. Brown & Root, Inc., 598 So.2d 1325 (Ala.1992).
I believe the defendant sufficiently established (1) that Mr. Halsey appreciated the danger associated with using the unauthorized extension;[3] and (2) that based upon that appreciation he was conscious of the danger that caused the accident at the moment the incident occurred. See Owens v. National Security of Alabama, Inc., 454 So.2d 1387 (Ala.1984); Furgerson v. Dresser Industries, Inc., 438 So.2d 732 (Ala.1983); Elba Wood Products, Inc. v. Brackin, 356 So.2d 119 (Ala.1978); Kingsberry Homes Corp. v. Ralston, 285 Ala. 600, 235 So.2d 371 (1970). Consequently, I believe the trial court properly entered the summary judgment on the grounds that Mr. Halsey was contributorily negligent as a matter of law.
Furthermore, as I understand the evidence, it is uncontradicted that Mr. Halsey used a padlock and a "keeper pin" to extend a chain that was being used to hold on a pole a platform on which he was working.
It is uncontradicted that Alabama Power Company (Mr. Halsey's employer) and the *615 manufacturer, Chance, had policies providing that the only proper method for extending chains on platforms or pivot attachments was to use extension chains manufactured by Chance (or compatible extension chains manufactured by another company) and that Mr. Halsey used his own method of extending the chain. Even one of Mrs. Halsey's expert witnesses, Dr. Paul Packman, testified that "[t]he accident probably would not have taken place if Mr. Halsey had not used the keeper pin as part of the connector" to extend the platform. Five of Mr. Halsey's coworkers also agreed that it was obvious that the keeper pin could not hold the weight that would be placed upon it when it was used as part of a platform chain extension.
Although I recognize that a summary judgment is rarely appropriate in a negligence case, the facts and circumstances of this case convince me that the trial judge properly entered the summary judgment for the defendant based upon the defenses of contributory negligence and assumption of the risk.[4] I would affirm; therefore, I must respectfully dissent.
SEE, J., concurs.
NOTES
[1] Neither party contests that Chance manufactured extension chains that were to be used when platform chains would not fit around utility poles. Nor is it contested that this accident would not have occurred had Mr. Halsey not used the keeper pin as a loadbearing device.
[2] Although the padlocks were not an acceptable device for extending the chains, the evidence was undisputed that the cause of the fall was the keeper pin and not the padlocks used by Alabama Power.
[3] My conclusion is based on the evidence presented by the defendant (a) that the only extension authorized by the manufacturer is the extension chain it produces or an equivalent extension chain produced by another manufacturer, (b) that Alabama Power Company's policy specifies that the only proper extension method was to use one of these chains, (c) that Alabama Power Company maintained 50 to 100 of the proper extensions, and (d) that before the accident Mr. Halsey's crew leader had offered to show him the correct way to extend the chains, but Halsey declined the demonstration.
[4] See Casrell v. Altec Industries, Inc., 335 So.2d 128, 132-33 (Ala.1976).